**UNITED STATES, Appellee,**

v.

**Ralph MALING, Defendant, Appellant.**

**No. 92–1698.**

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1992.

Decided March 5, 1993.

Joshua L. Dratel with whom Gerald B. Lefcourt, P.C., New York City, was on brief, for defendant, appellant.

Frederick E. Dashiell, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and Paul V. Kelly, Asst. U.S. Atty., Boston, MA, were on brief, for appellee.

9. As we have not heard argument on those claims we cannot answer that question.

Before BREYER, Chief Judge, HIGGINBOTHAM,* Senior Circuit Judge, and BOUDIN, Circuit Judge.

BREYER, Chief Judge.

Ralph Maling appeals from a judgment imposing a fine as partial punishment for drug crimes. He argues, in essence, that the court wanted to set the fine at a level that would credit him with the value of property to be forfeited. He adds that the court failed to do so. And, the Government, he says, is responsible for this failure. We find the district court's determinations lawful, and we affirm its judgment.

I

*Background*

The reader should keep in mind the following two sets of background events:

*Forfeitures.* In May 1990, Maling and the Government entered into a Plea Agreement, in which Maling (and several co-defendants) agreed to forfeit property that would have a total value of $2.8 million. In September 1990, Maling signed a separate agreement in which he promised to forfeit assets (listed in the agreement's Appendix A) including some condominiums owned by J & R Properties, Inc., a firm of which he and James Taglienti each owned half. On September 20, 1990, the district court entered an initial "Amended Order of Forfeiture," which listed the condominiums (among other properties) as items *subject to* forfeiture (the forfeiture itself to take place only after the court had an opportunity to consider any competing claims to the property). *See* 21 U.S.C. § 853(a), (p) (providing for assets to be made subject to forfeiture); § 853(n)(7) (providing a mechanism for forfeiture actually to occur); *United States v. Schwimmer*, 968 F.2d 1570, 1576 n. 4 (2d Cir.1992) (interpreting the RICO equivalent of § 853(n)(7) as implying that the Government does not take good title to forfeited property until after competing claims are determined); Amended Order of Forfeiture, ¶ 8. On November 13, 1990, Taglienti filed a petition objecting, under 21 U.S.C. § 853(n), to the forfeiture of the J & R condominiums on the ground that he (through J & R) owned a half interest in them. The Government then refused to accept the condominiums as satisfying (in part) Maling's forfeiture obligation. And, on May 26, 1992, the district court entered a "Final Order of Forfeiture," which forfeited other property, but which specifically said that the condominiums were *not* forfeited.

*The Fine.* In September 1990, the district court imposed a fine of $250,000 as partial punishment following Maling's guilty plea to drug charges. Maling appealed. *See United States v. Maling*, 942 F.2d 808 (1st Cir.1991) ("*Maling I*"). He argued that the Plea Agreement had assumed that the defendants would pay no more (in fines plus forfeitures) than $2.8 million total. He added that the fine plus forfeitures would exceed that amount. We agreed that the Plea Agreement did assume a $2.8 million "ceiling," but we held that the Plea Agreement bound the parties, not the district court. Nonetheless, we concluded that there had been "confusion during the sentencing proceedings about the meaning of the Plea Agreement." And, because of that confusion, we would "vacate the sentence insofar as it imposes fines ... and remand for resentencing in respect to fines." *Id.* at 811. We said specifically:

> *Although the Agreement does not bind the district court,* we believe the appellants should now be sentenced with the district court fully aware of the Agreement's efforts to impose a $2.8 million cap upon the appellants' total financial liability.

*Id.* (emphasis added).

On remand, the district court received written submissions from the parties and held three further hearings. The court said that it wished to impose fines such that the "total financial liability" would amount to $2.8 million. The court then entered judgment imposing a fine of $634,-000 against Maling. He now appeals that judgment.

* Of the Third Circuit, sitting by designation.

## II

### The Size of the Gap

The district court made clear that its basic objective in assessing a fine in the amount of $634,000 was to fill a gap—the gap between the value of the assets forfeited and the $2.8 million Plea Agreement "ceiling." Maling says the district court was mistaken in believing there was such a gap. In particular, he says, the gap was filled, without the fine, by 1) his forfeiture of condominiums owned by J & R Properties, Inc., valued at $300,000, and 2) his forfeiture of property in Westwood, valued at $335,000. The Government refuses to accept the condominiums; it agrees that Maling forfeited the Westwood property after entry of the $634,000 judgment and that the judgment must be modified to take its value into account. (The district court expressly left the judgment open for sixty days so that it could be modified.) The Government disagrees, however, about the value of that property.

The upshot is that the Government believes Maling must pay a fine of $344,000, while Maling believes he need not pay any fine at all. The difference reflects the disagreements about whether the Government must accept the J & R condominiums (worth $300,000) and about the value of the Westwood property (the difference in valuations amounting to $45,000).

■ Before turning to the disagreements, we point out that the district court has broad legal powers to determine the amount of the fine. See Fed.R.Crim.P. 11(e)(1)(B); Maling I, 942 F.2d at 810 (court not bound by sentencing recommendations derived from Plea Agreement) (citing cases); 21 U.S.C. § 848(a) (authorizing a fine of up to $2 million for one of the offenses of which Maling was convicted); U.S.S.G. § 5E1.2(c)(4) (Sentencing Guidelines do not constrain fines where statute authorizes fines in excess of $250,000); United States v. Savoie, 985 F.2d 612, 619–620 (1st Cir.1993) (appellate review of fines imposed by the district court is under "an abuse-of-discretion rubric" only). The court was not legally compelled to limit its fine to the size of the gap (though it quite reasonably chose to do so). Similarly, the court was not legally required to measure the gap precisely or to engage in professional matters of appraisal or make technical property law determinations in doing so. The law would permit the court to assess its fine on the basis of a rough estimate of the gap size, or on an assumption that the Government would probably, but not definitely, win disputed matters in respect to what was, or what was not, forfeitable under the Plea Agreement. For this reason, we review the district court's judgments about "gap size" with a degree of deference.

■ a. The J & R Condominiums. Maling must concede that there is a $300,000 gap, for, in fact, he has not forfeited the J & R condominiums. Rather, he argues that the Government should have accepted the condominiums for forfeiture, and the district court should have assessed the fine as if the Government had done so. His claim that the Government had to accept the condominiums stems from the Plea Agreement, which says that the parties will enter into a "separate agreement" that "specifically describe[s]" the "property and assets" to be forfeited. That "separate agreement" (as we have said) lists the J & R condominiums among those assets. Consequently, says Maling, the Government, having signed this "separate agreement," cannot later reject the assets that it listed.

The Plea Agreement, however, contains an important qualification. It says that "physical assets" will satisfy the "forfeiture" obligation only if those physical assets are "without any encumbrances." This qualification affects the "separate agreement" subsequently made pursuant to the Plea Agreement. Thus, we read the Government's September 1990 agreement, accepting the forfeiture of "[a]ny and all interest of J & R Properties, Inc." (our emphasis) in the condominiums (not merely the "interest" of Maling) as conditioned on the condominiums' being unencumbered when forfeited. As we have said, after the parties signed that "separate agreement" and after Maling (as J & R's President and Treasurer) purported to convey the J & R

condominiums to the Government (but before the forfeiture order was final), Maling's J & R co-owner James Taglienti filed a petition with the court, under 21 U.S.C. § 853(n), objecting to the forfeiture on the ground that he had a fifty percent interest in the condominiums. The Government asked the court to omit the condominiums from its final forfeiture order because it considered the petition an "encumbrance."

Maling argues that neither the petition (nor a later-filed state tax lien, which we need not consider) amounts to an "encumbrance." First, he says that Taglienti's petition is without legal merit, for Taglienti, too, was involved in (or knew about) relevant drug activities, which involvement would prevent him from saving his interests in the condominiums from forfeiture. *See* 21 U.S.C. § 853(c), (n)(6). He adds that, even if Taglienti's petition is otherwise valid, the Government received title documents from J & R's President and Treasurer (Maling) in "good faith," which fact, under Massachusetts law, means the Government takes title free of Taglienti's asserted interests. Mass.Gen.L. ch. 155, § 8; ch. 156B, § 115; *cf. United States v. New Silver Palace Restaurant, Inc.,* 810 F.Supp. 440, 442–44 (E.D.N.Y.1992) (finding shareholders' rights in respect to corporate assets to be an inadequate basis for a petition against forfeiture under 21 U.S.C. § 881).

We need not consider whether or not Maling is correct about the merits of Taglienti's claim, however, nor need the district court have done so. We read the phrase "without any encumbrances" as one who buys property would likely read it, namely as imposing upon the conveyer an obligation to clear up any asserted legal claims upon that property prior to transfer, so that the buyer will receive the property alone, instead of receiving "the property plus the obligation to fight a lawsuit" (regardless of whether the lawsuit ultimately turns out to be unfounded). *See American Law of Property* § 18.84 (A. James Casner ed., 1952) ("A pending action assailing a vendor's title or asserting an interest therein or a lien thereon of which a purchaser has notice is at least a cloud on the title. Since a court will not compel a purchaser to 'buy a lawsuit,' the pendency of one of the character indicated is an encumbrance.") (citations omitted). Such a reading would avoid imposing upon the Government title-clearing obligations that it does not wish to undertake, without (ordinarily) harming the potential transferor (who simply would retain whatever property interest he previously owned). Maling points to nothing that might suggest that this natural reading of the agreement is incorrect.

Such a reading ends the argument. To adjudicate the merits of Taglienti's claim would require a legal proceeding (perhaps a rather complicated one), as would any effort to demonstrate that the Government (which had long known that Taglienti was Maling's J & R co-owner) was a "good faith" transferee entitled to clear title in all the property, *irrespective* of the merits of Taglienti's claim. *See* Mass.Gen.L. ch. 155, § 8; ch. 156B, § 115 (requiring "good faith" for transferee of real estate from corporation to take free of rights of owners of corporation). Hence, we see nothing unlawful about the district court construing the Plea Agreement's word "encumbrance" as encompassing the Taglienti petition.

Maling also claims that the Government is "estopped" from refusing to accept the condominiums. Estoppel, however, requires a statement or promise or action that leads to reasonable reliance to one's detriment. *See, e.g., Restatement (Second) of Contracts* § 90(1) (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee ... *and which does induce such action or forbearance* is binding if injustice can be avoided only by enforcement of the promise.") (emphasis added). We cannot find a statement or action by the Government, in respect to the condominiums, that led Maling reasonably to rely to his detriment on the Government's keeping the condominiums despite a pre-final-order "encumbrance" which, under the plea agreement, entitled it to reject them. The Government, we concede, *knew* (as, of course, did Maling) that Taglienti was a J & R co-owner long before the

condominiums appeared on the "separate agreement" forfeiture list. But, Maling points to no statement or action that suggests that the Government, rather than Maling, was *responsible* for preventing any such legal "cloud" upon the property from arising, or for removing it once it arose. We also concede that the Government, for a time, accepted condominium rents (presumably because it anticipated that forfeiture would transfer the property to the Government with retroactive effect, 21 U.S.C. § 853(c)). But, we do not see how Maling is any the worse for its having done so (assuming, of course, that the Government pays over to him the rents it received). That is to say, we do not see how the Government's *returning* the property makes Maling significantly worse off than had the Government never *included* the property on the "separate agreement" list in the first place. The district court could reasonably have found no "reliance to his detriment" on Maling's part and therefore no "estoppel."

Maling's strongest argument is that he *wanted* to clear Taglienti's "encumbrance;" indeed, he asked the court to permit him to prove that Taglienti was not the kind of "good faith" or innocent owner who could object to forfeiture of his own (i.e., Taglienti's) interest in the property. *See* 21 U.S.C. § 853(n)(6). But, once the Government told the court that it did not want the condominiums, the court simply denied Maling's request as "moot." Maling, in essence, asks, "How can the Government turn down the property as encumbered without letting me remove the encumbrance?"

The short, conclusive answer to this question lies in the Plea Agreement itself. It says the Government can turn down encumbered property. It does not say the Government must give Maling a chance to remove an encumbrance. And, we will not read such a right into the Agreement, at least, in respect to this *kind* of removal of an encumbrance. Maling does not offer to show that Taglienti does not *own* the property. Rather, he wants to intervene in the special statutory "third party versus Government" proceedings to show that the Government *could* defeat Taglienti's inter-

est, if it decided to try to do so. 21 U.S.C. § 853(c), (n)(6). But, the statute creates those special proceedings, placing a special burden on third parties to prove that they have "clean hands," in order to benefit *the Government*. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 82, 191–92, 208, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3265, 3374–75, 3391 (expressing purposes of removing obstacles in the way of federal law enforcement agencies seeking forfeiture, of ensuring expedition, and of protecting third parties); *United States v. Regan*, 858 F.2d 115, 121 (2d Cir.1988) ("orders directed at third parties are strong medicine and should not be used where measures that are adequate and less burdensome on the third parties are available."). They are not designed to help defendants who would like to see some *other* person's property forfeited, thereby perhaps obtaining credit. Thus, we think the court acted lawfully in denying Maling's petition for such a proceeding.

Is this result unfair to Maling? One can imagine circumstances that could make it seem so. Suppose, for example, that the Government, knowing full well that Taglienti would likely create an encumbrance (i.e., file a petition objecting to the forfeiture) led Maling down the garden path. On the other hand, one can easily imagine circumstances that indicate the contrary. Suppose, for example, that the Government assumed that Taglienti would not object (or that Maling could persuade him not to object); or, suppose that the Government did not think about the matter and Maling simply saw a fleeting opportunity to satisfy a portion of his debt with someone else's property. Regardless, this kind of ultimate fairness or unfairness to Maling would arise out of facts and circumstances of which we know little. And, it is beside the point. The Government and Maling signed an Agreement the language of which placed the risk of this, and any other, encumbrance upon Maling. In all likelihood the Government wanted this language so that it would not have to become involved in the kind of property law disagreements that Maling now raises. The district court

so interpreted the Agreement. It based its fine upon that interpretation. In our view, the district court's view is reasonable; and the resulting fine is therefore lawful.

■ b. *The Westwood Property.* Maling argues about the value of his forfeited Westwood property, property which was not included in the September 1990 "separate agreement" list and which he offered to forfeit for the first time in about September 1991. An appraisal made about seventeen months earlier (before the plea agreement) valued the property at $335,000. By late 1991, when Maling offered the property to the Government, its value had declined to $245,000. The Government told the court that, for purposes of assessing the "gap-filling" fine, it would assume the property was worth $290,000, thereby "splitting the difference" between the two evaluations.

Maling argues that he should be credited with the higher valuation. But, we can find no promise by the Government that it would do so. And, in the absence of such a promise, we are aware of no law that would prevent the Government from advising the court that the property should be assessed at $290,000 for "gap-filling" purposes. In the absence of some specific agreement about valuation dates, "splitting the difference" does not seem unreasonable to us; and we do not know why the district court could not have reached a similar conclusion.

## III

### Recommending a Fine

The Plea Agreement, while leaving the court free to impose a fine, nonetheless prohibits the Government from *recommending* a fine. *See Maling I,* 942 F.2d at 810–11. Maling says that the Government violated this obligation when counsel told the district court, for example:

> If the Court is entertaining the thought of a fine, my suggestion in [sic] how that should be fashioned ... is that the Court should issue an order of a criminal fine in the amount of $634,000.

Taken out of context, this statement, and a few others like it, might suggest a not-very-subtle attempt to avoid the "no recommendation" obligation. *Cf. United States v. Canada,* 960 F.2d 263, 269 (1st Cir.1992) (we will not allow the Government to pay "lip service" to a plea agreement and then do "end-runs" around it). But, in context, the statements are perfectly proper.

The context reveals that the district court had already decided to impose a fine despite the absence of a fine recommendation. The context makes clear that the court wanted, or could benefit from, discussion, recommendations, and argument from *all* counsel, about the amount of fine that would keep the total monetary liability within the $2.8 million "ceiling." Government counsel, stating specifically that the "U.S. Government is not recommending to this Court that they [sic] impose a fine," went on to respond to the court's request to help it determine the proper amount of the fine that the court independently had decided to impose. We see no violation of the Plea Agreement.

The judgment of the district court is

*Affirmed.*