UNITED STATES of America, Plaintiff,

v.

Jose V. ANDRADE, Jr., Defendant.

Criminal Action No. 95–10125–RCL.

United States District Court,
D. Massachusetts.

May 8, 1996.

Miriam Conrad, Office of the Federal Defender, Boston, MA, for Defendant Andrade.

John T. Lu, Lowell, MA, for Defendant Todd.

Richard N. Ivker, Boston, MA, for Defendant Pires.

Michael B. Keating, Gregory T. Moffatt, Foley, Hoag & Eliot, Boston, MA, for Defendant Smith.

James Lang, United States Attorney's Office, Boston, MA, for U.S.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDSAY, District Judge.

Before the court are two motions of the defendant, Jose V. Andrade, Jr., to suppress. In one, Andrade seeks to suppress statements allegedly made by him to law enforcement officers on December 16 and December 19, 1994, together with any fruits of those statements. In the second, he seeks suppression of two guns, a firearms manual and ammunition seized during a warrantless search of the third floor apartment at 21 Inwood Street, Dorchester, Massachusetts [1] on December 16, 1994. As grounds for the first motion, Andrade argues that the statements alleged were the product of an unlawful arrest and were, in addition, involuntarily extracted from him in violation of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). As to the second motion, Andrade argues that the items in question were seized in violation of his rights under the Fourth and Fifth amendments to the Constitution.

An evidentiary hearing on the motions was held on January 25 and 26 and February 12, 13 and 14, 1996.

---

[1]. The attic at that location was also searched. The government has indicated, however, that it will not seek to introduce at trial any items seized from the attic. Accordingly, only the items seized from the third floor apartment at 21 Inwood Street are at issue.

## I. *Findings of Background Facts*

Based on the record of the evidentiary hearing, the court finds the following background facts.

On December 16, 1994, Detective Robert Merner, a Boston police officer assigned to the City's Youth Violence Strike Force ("YVSF"), stopped an automobile which Andrade was driving on Columbia Road in Dorchester, Massachusetts. The stop followed a surveillance of Andrade on December 16 by law enforcement officers. The stop was ordered by Detective Sergeant Paul Joyce, Merner's superior in the YVSF. At the time the stop was made, Andrade had been a target of an investigation of several months' duration for what was believed by law enforcement officials to be his trafficking in firearms in the City of Boston; his license to operate a motor vehicle in Massachusetts was then under suspension; and he was the subject of an arrest warrant issued by the Immigration and Naturalization Service ("INS"). At the time he took Andrade into custody, Merner had been informed by other law enforcement officers of the existence of the INS warrant and of the suspension of Andrade's license to operate a motor vehicle. As a participant in the gun-trafficking investigation, Merner was aware of information which led him reasonably to believe that he had probable cause to arrest Andrade for various firearm offenses. He also reasonably believed that he had probable cause to arrest Andrade on the INS warrant and for operating a motor vehicle with his license under suspension.

After he took Andrade into custody, Merner transported Andrade to the headquarters of the YVSF at the Roxbury, Massachusetts substation of the Boston Police Department. At no time did Merner advise Andrade of his *Miranda* rights.[2] No booking facilities existed at the Roxbury substation, and Andrade was not formally charged with any crime.

---

[2]. *Miranda*, 384 U.S. at 478–79, 86 S.Ct. at 1629–31 (1966).

Andrade was detained at the Roxbury substation for about four hours, during part of which time he was handcuffed to a chair in a 12 feet by 12 feet room called the detectives' room.

While he was detained at the Roxbury substation, Andrade was intermittently questioned by law enforcement officers. One such officer was a special agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Daniel E. Campbell. Campbell was at the Roxbury substation when Andrade arrived and was the first officer to interrogate Andrade. Before doing so, Campbell read to Andrade, from a printed card, Andrade's *Miranda* rights. He did so in the presence of Massachusetts State Police Officer, Francis J. Matthews, who was also assigned to the YVSF. Andrade stated to the officers that he understood his rights.

At the time of Campbell's initial interrogation of Andrade, Campbell and officers of the YVSF were preparing to execute search warrants at the first floor apartment at 66 Richfield Street in Dorchester, Massachusetts, where Andrade was believed to be residing with his family, and at the first floor apartment at 21 Inwood Street, Dorchester, where a relative of Andrade resided. The warrants had been issued by a United States Magistrate Judge to permit searches of the premises in question for firearms and evidence of the distribution of firearms.

Campbell told Andrade that Andrade was suspected of trafficking in firearms between Mississippi and Massachusetts, and that Campbell and other law enforcement officers planned to execute search warrants at 66 Richfield Street and 21 Inwood Street. Andrade replied that he was not a dealer in firearms, but rather that he was a gun collector. Campbell then asked Andrade if a search of the Inwood Street and Richfield Street locations would produce anything of interest to law enforcement officers. Andrade replied that, in the third floor apartment at 21 Inwood Street, the officers would find two firearms, a shotgun and a .38 caliber revolver. Andrade resided in the third floor apartment at 21 Inwood Street with his girlfriend, Gabriella Spinola, during breaks in his attendance at college in Jackson, Mississippi.

At the time of Campbell's initial interrogation of Andrade, no search warrant had been issued to Campbell or other law enforcement officers for the third floor apartment at 21 Inwood Street. Campbell asked if Andrade would provide him with a key to that apartment, and Andrade declined, saying that the apartment belonged to Spinola, and not to him, and that Andrade, for that reason, could not give consent to a search of the apartment. Andrade did provide Campbell with Spinola's workplace telephone number.

Spinola, a high school graduate with computer training, worked in customer service at Neighborhood Health Plan, a health maintenance organization. By December 16, 1994, she had held that job for more than five years.

After obtaining Spinola's workplace telephone number from Andrade, Campbell left the Roxbury substation to execute the search warrants. Matthews remained with Andrade, guarding him. At some point during his stay in the detectives' room with Matthews, Andrade was visited by INS special agent Joseph A. Gaeta. Gaeta began to ask questions of Andrade concerning immigration matters, but Andrade became very agitated and, with a wave of the hand, dismissed Gaeta. Matthews then asked Gaeta to step outside the room. Gaeta did so and did not question Andrade further that day.

Following Gaeta's departure from the detectives' room, and while Matthews and Andrade were still together, Merner came in and overheard Andrade protesting to Matthews that he was a college student and not a dealer in firearms. Merner spoke to Andrade disapprovingly, "[telling him] . . . not to give us the college student wrap [sic], that . . . Andrade was in the business of selling firearms to young Cape Verdian males from his neighborhood. And in fact . . . Andrade was selling death in this neighborhood to young kids. . . ." At this point Andrade directed heated words to Merner and gave Merner a dismissive flick of the wrist. Matthews then asked Merner to leave the room, and Merner did so.

Matthews remained with Andrade for approximately two to three hours after Campbell left to execute the search warrants. Sometime after the Gaeta and Merner visits, Matthews asked Andrade whether Andrade understood what was happening and whether he wished to say anything. Specifically, Matthews testified: "I explained to [Andrade] that they were executing firearms search warrants, and that they are going to families or residents [sic] of his, and is there anything that you wish to say to me at that time." Andrade said to Matthews that Matthews did not understand "how big this is". That statement was repeated a number of times in response to questions from Matthews. When Matthews asked what the statement meant, Andrade did not reply.

At some point, in response to Matthews questions, Andrade indicated by words, actions, or both, in a manner sufficient for Matthews to understand, that Andrade no longer wished to talk about the warrants or about matters relating to the warrants. As Matthews testified at one point during the evidentiary hearing: "[Andrade] didn't want to have any conversation about that." Or as Matthews testified at another point: ". . . [Andrade] didn't seem to want to be very talkative to me." Thereafter, Andrade fell silent, appearing at times to fall asleep. Observing Andrade in apparent sleep, Matthews said to him "Look, if you don't want to say anything at all, then I have other things to do. I won't keep prodding you." Andrade did not reply. Matthews, who had been doing paperwork while sitting with Andrade, now occupied himself fully with that paperwork. Thereafter, Andrade and Matthews discussed nothing of substance for a period of two hours, at which point Campbell returned from executing the search warrants.

At no time during his stay in the detectives' room did Andrade ask that a lawyer be provided for him.

While Andrade remained in the detectives' room, Campbell and a number of other law enforcement officers proceeded to execute the search warrants at the first floor apartments at each of 66 Richfield Street and 21 Inwood Street. The officers did not recover any firearms at either apartment.

While the search of the two apartments proceeded, Campbell telephoned Spinola at the number that had been provided to him by Andrade. Campbell told Spinola that Andrade was in custody, and that law enforcement officers wished to search her apartment for two guns which Andrade had told them could be found in her apartment. Campbell told Spinola that he sought her permission to search the apartment, but that he would have to get that permission in person. Spinola agreed to return to her home and did so return.

When she arrived there, she encountered a number of law enforcement officers, some on the porch, some inside the building in or near the first floor apartment. As she proceeded to her third floor apartment, Spinola encountered Campbell, who asked if she were Gabriella Spinola. When she replied that she was, Campbell told her, "You are lucky because I was just about to go to get a search warrant so I could break down your door."

Upon reaching her third floor apartment, Spinola, with Campbell's help, opened the door. Campbell then presented Spinola with a typed "consent search waiver" form issued by ATF. By its terms, the form advises the consenting person that the consenting person has the right to refuse permission for the search; that any evidence found during the search may be used against the consenting person in court; that prior to permitting the search to be made, the consenting person has a right to require the searching officers to secure a search warrant; and that if permission to search is given, the consenting person has the right to stop the search at any time. The form also states, just above the line for the signature of the consenting person, that the consenting person has read the statement; that the consenting person understands what his/her rights are; that the consenting person has given consent without threats, promises, pressure or force of any kind; and that consent is given voluntarily and intentionally.

The search then proceeded. In a rear bedroom closet, one of the searching officers, John Davin of the YVSF, found and seized a Mossberg pump-shotgun. In the front bed-

room of the apartment, on top of a hutch, Davin found and seized a .38 caliber revolver, a scale, a vinyl bag containing several rounds of ammunition, and an Intratech Arms manual. The vinyl bag was open and next to the revolver.

During the search, Spinola was permitted to leave the apartment, and did leave it unaccompanied, to attend to and comfort her mother who was present in the first floor apartment at 21 Inwood Street and upset by the commotion of the search there.

Once the officers had concluded their search of Spinola's apartment, one of them suggested to Spinola that she write and sign a statement to the effect that the seized items did not belong to her, and that she was unaware of the presence of the items in her apartment. The document was prepared in the following manner. The officer asked Spinola questions, and when she gave answers, he asked her to write down those answers on a blank sheet of paper he provided to her. Thus prepared, the document provides personal information about Spinola and information about her relationship with Andrade. It also says that Spinola had signed the consent search waiver upon arriving at her apartment, and that Spinola had no knowledge that the guns were in her apartment.

After the search was concluded, Campbell returned to the Roxbury substation. He found Andrade with Trooper Matthews in the detectives' room. Andrade appeared to be sleeping. He was awakened and Campbell and Matthews escorted him down a hallway to Joyce's office. Campbell, Matthews and Andrade sat down.[3] At that point, Campbell asked Andrade whether he understood the rights that had been read to him earlier in the day. Andrade replied that he did understand his rights.

Campbell told Andrade that he (Campbell) knew that Andrade had purchased firearms in Mississippi through confederates, Terrance Smith and Christopher Todd, and that Andrade had planned to bring those weapons back to Massachusetts for sale. Campbell also told him that Smith had admitted purchasing six .25 caliber pistols and trans-

ferring them to Andrade for resale in Massachusetts. At some point during this conversation, Andrade acknowledged that he knew Smith and Todd, and that he was present with them when they purchased firearms in Mississippi. Andrade also acknowledged receipt of the six .25 caliber pistols purchased by Smith. He stated that he transferred the firearms purchased by Smith and Todd in Mississippi to three individuals, "Clarence," "Larry," and "Hayes." He also admitted having sold several guns to a John Ramos and to a Barry Street, and that he had given another firearm to someone named "Louis".

Andrade then told Campbell that he wanted to cooperate. Campbell told Andrade that if he cooperated he could walk out of the door. Campbell said that the specific cooperation he was looking for was Andrade's help in finding nineteen guns that had recently arrived in Massachusetts. Andrade said that he would help locate those weapons. Andrade was then released.

On December 19, 1994, Campbell went to Andrade's home with Detective Robert Fratalia of the Boston Police Department. Andrade invited the officers into his home. The officers told Andrade that they were there to follow up on Andrade's statement that he would cooperate with them in locating nineteen guns transported into Massachusetts. Andrade then told the officers that Clarence, Larry and Hayes, who had received from him the guns purchased in Mississippi, would be traveling to Boston with forty to fifty firearms and a quantity of cocaine. He told the officers that he would be willing to introduce an undercover agent to Clarence, Larry and Hayes in an effort to extricate himself from his own legal problems. There the conversation ended.

No *Miranda* rights were read to Andrade on December 19, 1994.

II. *Additional and Ultimate Findings of Fact and Conclusions of Law*

A. *Initial Statements Made by Andrade*

1. *Lawfulness of Andrade's Arrest*

Andrade claims that he was unlawfully seized and detained in violation of his Fourth

---

**3.** It appears that Joyce was not present at this     meeting in his office.

Amendment rights when Merner arrested him in Dorchester on December 16. He claims that any statements he made following this unlawful procedure should be suppressed because of the unlawful seizure. The court disagrees with the premise that Andrade was unlawfully arrested.

At the time Merner arrested Andrade, there existed three bases for the arrest. Merner was aware of all three. First, Andrade was operating a motor vehicle with his license under suspension. Second, there was outstanding an INS arrest warrant for Andrade. Finally, there was probable cause to arrest Andrade on various state and federal firearms offenses.

Andrade contends that his detention on December 16, 1994, was unlawful to the extent that it purports to be based (1) on the fact that his license to operate a motor vehicle was then under suspension or (2) on the fact that he was, at the time, subject to an INS arrest warrant. He claims that the actual reason for his arrest was that the law enforcement officers wished to question him in connection with their gun-trafficking investigation. Thus, Andrade argues, his arrest on the motor vehicle offense and on the basis of the INS warrant was a pretext and therefore unlawful, in violation of the Fourth Amendment.

■ The court need not address the pretext argument, because it determines that there was probable cause to arrest Andrade on December 16, 1994 for various firearms offenses. Among other things, the law enforcement officials involved in the investigation of Andrade had been advised by a confidential informant (who had given them other information about Andrade that had been independently corroborated) that Andrade, within the three weeks preceding the arrest, had shown the confidential informant three handguns, still in their boxes. They had been informed by a second confidential informant (who had provided reliable information in the past on other matters, and who had provided other information about Andrade that was independently verified) that Andrade frequently traveled between Mississippi (where he attended college) and Boston; and that on the trips from Mississippi, An-

drade brought to Boston firearms purchased in the South. Law enforcement officials had also been informed by Terrance Smith that he had purchased six handguns in November, 1994 for Andrade, who paid $25 for each firearm. Smith had also informed the officers that he was present with Andrade in December, 1994 when Andrade had purchased two pistols at a gun show in Jackson, Mississippi. The two pistols were a 9mm semi-automatic and a .45 caliber Mac-11. Smith had further informed the officers that the weapons purchased by or for Andrade in Mississippi were intended to be sold by Andrade in Boston for profit. An investigation by law enforcement officers had also led them to a weapons dealer in Jackson, Mississippi who identified Andrade's photograph, from an array, as a man who had accompanied Christopher Todd when Todd purchased a Brycol–Jennings 9mm pistol from the dealer on September 21, 1994. The Brycol–Jennings pistol was recovered on November 10, 1994 in Boston. Finally, law enforcement officers had determined from ATF records that Andrade was not a federally-licensed firearms dealer.

On the basis of all of the foregoing, law enforcement officials on December 16, 1994 had probable cause to arrest Andrade for violations of federal firearms laws which prohibited unlawful dealing in firearms and unlawful transportation/receipt of firearms into a state of residence. The court thus concludes that Andrade was lawfully arrested on December 16, 1994.

### 2. *The Reading of Miranda Rights*

Andrade next claims that he was never given his *Miranda* warnings before speaking to Campbell at the Roxbury substation. As noted above in the findings of background facts, the court has determined otherwise.

### 3. *Request for Counsel*

■ Andrade next contends that he was questioned after requesting an opportunity to consult with counsel. Under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and its progeny, law enforcement officers must cease custodial inter-

rogation of a suspect once the suspect has expressed his desire to consult with an attorney, unless the suspect himself initiates further communication with law enforcement officers. *Id.* at 484–85, 101 S.Ct. at 1884–85. Again, however, the court has found that Andrade did not request to speak with counsel. Accordingly, no violation of his rights under *Edwards* occurred.

### 4. *Deception of Andrade*

■ Andrade next argues that statements he made in his initial conversation with Campbell on December 16, 1994 were not made knowingly, intelligently and voluntarily because he was misled by Campbell as to the scope of the search warrant that Campbell had obtained with respect to 21 Inwood Street. Specifically, Andrade claims that when Campbell told him, during the initial conversation between the two, that Campbell had a warrant for 21 Inwood Street, he misled Andrade into believing that he had a warrant broad enough to include a search of the third floor apartment at 21 Inwood Street. Andrade claims that, because he believed that the officers inevitably would find two guns in the third floor apartment, he told them no more than what he believed they would find out for themselves upon execution of their search warrant.

*Miranda* holds that an accused does not voluntarily waive his rights under the Fifth Amendment if he is tricked by law enforcement officers into making a statement. *Miranda*, 384 U.S. at 476, 86 S.Ct. at 1628–29. The court is not persuaded, however, that, in this case, Andrade was tricked into acknowledging that there were guns present in the third floor apartment at 21 Inwood Street. It is true that Campbell did not tell Andrade specifically that his warrant to search the Inwood Street location was limited to the first floor apartment. There is no evidence, however, that Campbell was trying to trick or deceive Andrade. Indeed, the record suggests the opposite conclusion—that is, that Campbell did not intend to trick or deceive Andrade. There is no evidence, for example, that Campbell knew *anything* about the third floor apartment at 21 Inwood Street that would lead him, by deception, to try to

create "probable cause" to search that apartment. The likelihood is that if Campbell had known that Andrade resided in the third floor apartment on his returns to Boston from school in Mississippi, Campbell could have, and would have, obtained a warrant to search that apartment, as well as the first floor apartment at 21 Inwood Street.

The court, taking the record as a whole, concludes that Campbell's use of the phrase "21 Inwood Street," to describe the location of the place for which the search warrant had been authorized, was merely loose shorthand. Doubtlessly, there was much about that warrant—apart from the specific apartment to be searched—that Campbell did not tell Andrade. He did not describe in detail, for example, all the specific items for which the warrant authorized search and seizure. Andrade has cited no case which stands for the proposition that, in the circumstances presented here, Campbell was under a duty to lay out the full contours of his search warrant.

Moreover, there is little evidence about what Andrade's state of mind *actually* was when he learned about the warrants; but what little evidence there is persuades the court that Andrade was not tricked or deceived by anything Campbell said. The best evidence of record of what Andrade's state of mind was, at the time he learned about the warrants, is Andrade himself. In an affidavit he filed in support of his motion to suppress, Andrade makes no mention of having been tricked or deceived by Campbell regarding the scope of the warrant for the search at 21 Inwood Street. He does say that he did not voluntarily, knowingly or intelligently waive his rights, but all he says in support of that conclusory statement is that he believed that he would not be allowed to obtain his release from custody unless he answered the officers' questions.

The record indicates that the very first thing Andrade said to Campbell when the latter told him that he was under investigation for gun-trafficking was that he was not a gun dealer, but rather a gun collector. The court infers from the record as a whole that this statement was designed to be exculpatory—an explanation that would account for

any guns that the officers might, as a result of their investigation, trace to him. His statement to Campbell about the guns in the third floor apartment of 21 Inwood Street was made with the same purpose.

5. *Summary of Rulings in Section A of these Additional and Ultimate Findings of Fact and Conclusions of Law*

For all of the reasons stated in subparts 1, 2, 3 and 4 of Section A of these additional and ultimate findings of fact and conclusions of law, the court concludes that suppression of the initial conversation between Campbell and Andrade on December 16, 1994 is not required. The statements made by Andrade during that conversation were knowingly and voluntarily made after a lawful arrest and after Andrade was given his *Miranda* warnings.

B. *Statements Made After the Initial Interrogation by Campbell*

1. *Statements Made to Matthews*

In addition to his other claims, Andrade claims that statements he made to Matthews during the period of Campbell's absence and statements made to Campbell and Matthews after Campbell's return from executing the search warrants were extracted in violation of his Fifth Amendment rights, because they were made after he invoked his right to remain silent.

■ "If [an individual undergoing custodial interrogation] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona,* 384 U.S. 436, 473–474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). The Supreme Court has had recent occasion to explicate the meaning the phrase "indicates in any manner" as it pertains to the assertion by an individual of his *Miranda* rights and the obligation of law enforcement officers to desist in their questioning of that individual. *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). *Davis* addressed the question of how courts are to determine whether an individual in custody has invoked his right to counsel such that

questioning of him must cease in accordance with the principle established in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Setting forth what has come to be known as the "clear articulation rule" the court said that the person subjected to custodial interrogation, "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* —— U.S. at ——, 114 S.Ct. at 2355. If the statement is ambiguous, as judged by this objective standard, the interrogating officer is not required to stop his questioning. *Id.*

Since the decision in *Davis,* other courts have extended the clear articulation rule to an individual's invocation of the right to remain silent. *See, e.g., Coleman v. Singletary,* 30 F.3d 1420, 1424–1425 (11th Cir.1994); *Evans v. Demosthenes,* 902 F.Supp. 1253, 1259 & n. 10 (D.Nev.1995); *State v. Bacon,* 658 A.2d 54, 65 (Vt.1995); *State v. Williams,* 535 N.W.2d 277, 284–285 (Minn.1995).

■ Noting that a concern in *Davis* was to craft " 'a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information,' " *Coleman v. Singletary,* 30 F.3d at 1424 (*quoting Davis,* —— U.S. at ——, 114 S.Ct. at 2352), the Eleventh Circuit, opined that the same concern applies to the invocation of the right to remain silent. Accordingly, that court held that

A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.

*Id.* This court agrees with the Eleventh Circuit that the concern that led to the clear articulation rule with respect to the invocation of right to counsel is no less significant in the case of an invocation of the right to remain silent. That concerns applies not only when the suspect has made an equivocal

statement, but also in the case of silence itself. How should the police interpret, for example, a momentary hesitation or a reflective pause? When is the length of silence sufficient to indicate that the suspect intends to stand on his right to remain silent? Making these difficult judgments under the dynamic conditions of a police investigation is the kind of burden that the bright line of the clear articulation rule was designed to ease. There is thus no less need for a bright line when the right to remain silent is concerned than there is when the right to counsel is involved. Nor is the burden on the suspect of clear articulation of the right to silence an especially onerous one. As the Supreme Court noted in *Davis,* the suspect "need not 'speak with the discrimination of an Oxford don.'" *Davis,* —— U.S. at ——, 114 S.Ct. at 2355 (*quoting* Souter, J., concurring in the judgment in *Davis* at ——, 114 S.Ct. at 2364). All he need do is indicate in a clear and unambiguous manner that he intends to remain silent. The Court holds then that the clear articulation rule applies in the circumstances in this case.

Andrade claims he invoked his right to remain silent on three separate occasions: once when Gaeta spoke to him, again when Merner spoke to him and finally in response to Matthews' questions.

■ As noted in the findings of background facts, at some point during Andrade's detention, Gaeta, and later Merner, attempted conversations with Andrade. Gaeta questioned Andrade about immigration matters, and Merner accused Andrade of peddling death in his community. Andrade's reactions to these officers questions were similar: he became agitated and gave each a dismissive gesture. These reactions are consistent, to be sure, with a desire not to talk to anyone about anything. But they are equally consistent with other intentions: that Andrade did not want to talk to *Gaeta* or *Merner* about *anything,* but that he was willing to talk to others; that Andrade did not like Gaeta or Merner; that Andrade did not want to *listen* to Gaeta and Merner; that Andrade wanted

to have no discussion with Gaeta or Merner about the particular subjects they wanted to discuss (i.e., respectively, Andrade's immigration status and Andrade's alleged neglect of the social implications of his suspected gun-trafficking). The officers present during the Gaeta and Merner encounters believed that Andrade's reaction to Gaeta and Merner bespoke the latter—Andrade's resistance to a discussion of his immigration status and of his lack of sensitivity to his social responsibility. In any event, Andrade's reactions to Gaeta and Merner were not free from ambiguity.[4] No statement made by Andrade after these equivocal reactions therefore need be suppressed unless there is another reason for suppression.

Andrade claims that there is another reason: his clear articulation to Matthews of his right to remain silent. It will be remembered that, after the departure of Gaeta and Merner, Andrade did something, said something, or both, that clearly indicated to Matthews that Andrade no longer wished to talk about the search warrants or matters relating to the search warrants. Thereafter, Andrade lapsed into somnolence.

■ At that point Andrade had clearly invoked his right to remain silent. Just as clearly, however, Matthews honored that right, saying to Andrade, "Look if you don't want to say anything at all, then I have other things to do. I won't keep prodding you." Matthews then returned to his paperwork. No further substantive conversation between Matthews and Andrade occurred after this time.

Before that time, however, Andrade had said to Matthews that Matthews did not "understand how big this thing is." The court rules that statement admissible.

### 2. *Statements Made to Campbell*

■ The question now arises whether statements made by Andrade to Campbell, after Campbell returned from executing the search warrants, should be suppressed. It was in this conversation that Andrade made

---

4. Moreover, the record indicates that when Andrade reacted negatively to Gaeta and Merner, Matthews employed the prophylaxis of asking them to leave the room; and in each case, the officer did so.

a number of self-incriminating statements, including acknowledging receipt from Todd and Smith of firearms purchased in Mississippi and selling or otherwise transferring firearms to others in Massachusetts. The conversation between Campbell and Andrade occurred after Andrade indicated to Matthews that he was unwilling to answer questions concerning the warrants and related matters.

At least an hour or two elapsed, however, before Campbell renewed his conversation with Andrade. Moreover, before he renewed that conversation, Campbell reminded Andrade of his *Miranda* rights, and Andrade acknowledged that he understood those rights. Under these circumstances, the court rules that Andrade's statement to Campbell made in this second conversation are admissible. *See Jackson v. Dugger,* 837 F.2d 1469, 1471–72 (11th Cir.), *cert denied,* 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988); *see* also *United States v. Pugh,* 25 F.3d 669, 673 (8th Cir.1994).

### 5. Summary of the Court's Rulings as to Statements Made After the Initial Conversation on December 16, 1994

For all of the foregoing reasons, and because the court does not find that the circumstances of Andrade's custody were such as to overbear his will, the court rules that all the statements made by Andrade to Matthews and Campbell after the initial conversation with Campbell, on December 16, 1994, are admissible.

### C. Statements Made on December 19, 1994

■ Andrade also seeks to exclude statements made to Campbell and Fratalia when they visited him in his home on December 19, 1994. On that occasion, Campbell testified, Andrade made statements regarding the plans of Clarence, Larry and Hayes to come to Boston with a number of firearms and a quantity of cocaine; and, according to Campbell, Andrade agreed to introduce the trio to an undercover law enforcement officer. Andrade claims that testimony concerning these statements should be suppressed because the statements made on December 19 were the product of statements made by Andrade in violation of his *Miranda* rights on December 16, 1994.

The court has ruled that the statements of December 16, 1994 were made after a lawful arrest and were made voluntarily after Andrade had been advised of his *Miranda* rights. Moreover, Andrade was not in custody on December 19, and Campbell and Fratalia were not required to give him *Miranda* warnings. *Miranda,* 384 U.S. at 477–78, 86 S.Ct. at 1629–30; *see also Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 2397–98, 110 L.Ed.2d 243 (1990). In addition, the statements of December 19 were voluntarily made. Accordingly, the court rules them admissible.

### D. Lawfulness of the Search of the Spinola Apartment

As to the search of Spinola's apartment, Andrade makes two arguments. First, he argues that that search was the product of statements extracted on December 16 in violation of his Fourth and Fifth Amendment rights. The court has disposed of this argument in Section A of these additional and ultimate findings of fact and conclusions of law. The second point made by Andrade, as to the search of Spinola's apartment, is that that search was not conducted pursuant to valid consent given by Spinola.

Spinola signed two documents—one a printed form and another written in her own hand—in which she appears to acknowledge her consent to the December 16 search of her apartment. These documents are powerful evidence of consent freely given. One of those documents, the consent search waiver form, clearly sets forth what Spinola's rights were regarding the requested search of her apartment and states on its face that no force, threats or pressure of any kind were used in obtaining the consent.[5] The question

---

**5.** Spinola freely acknowledged at the evidentiary hearing that her signature appears on the consent search waiver, and that the other document was the product of her answers to questions put to her by one of the officers. She testified that she had no clear memory of signing the consent search waiver, except that she was certain that she had not signed it before

raised in this case, however, is whether Spinola's purported consent, in general, and the consent search waiver, in particular, were in fact freely given.

■ The question of voluntariness of consent is to be resolved by reference to all of the circumstances of the purported consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). Among the factors a court should consider, in determining the voluntariness of a consent, are "the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of the police questioning or in the environment in which the questioning took place." *United States v. Twomey,* 884 F.2d 46, 51 (1st Cir. 1989).

■ Spinola had come home to her apartment at 21 Inwood Street in response to Campbell's request that he be allowed to search her apartment. To be sure, what she found there was a babel, with law enforcement officers on the porch, searching the first floor apartment and waiting for her to arrive at the third floor apartment. Moreover, Campbell said something to her about the possibility of his getting a search warrant to knock down her door and make the search.[6] To be sure, all of this likely produced alarm in Spinola. But the court finds the circumstances of December 16, 1994 at 21 Inwood Street to be no more destructive of voluntary consent than those reported in *United States v. Wilkinson,* 926 F.2d 22, 25 (1st Cir.1991), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991), *overruled on other grounds* by *Bailey v. United States,* — U.S. —, — — —, 116 S.Ct. 501, 505–06, 133 L.Ed.2d 472 (1995). In

*Wilkinson,* four law enforcement officers entered a house with guns drawn, handcuffed and frisked the defendant and threatened to "tear the place apart." The First Circuit upheld the district court's ruling that these circumstances did not vitiate the voluntariness of the defendant's consent to allow his duffel bag to be searched.

Spinola seemed to Campbell, at the time of the search, to be clear-headed. It appears that she was sufficiently composed that day to be able to comfort and assist her distressed mother. She appeared at the evidentiary hearing to be an intelligent, self-possessed woman. She testified to having worked for five and a half years in customer service for a health maintenance organization—a job that would seem to require a certain sophistication and an ability to deal with people who, from time to time at least, might seek her assistance while under conditions of stress. Taking all of this into account, the court is led to conclude that, in consenting to the search of her apartment, Spinola was motivated more by a desire to distance herself from any involvement in the matter that had caused the arrest of her friend, Andrade, than by any conduct of the officers.

The court rules that Spinola voluntarily consented to the search in the sense that no circumstance attending her consent "made [her] unaware of, or mistaken about, any key fact or unable physically to decide or to choose whether or not to agree to the search." *Wilkinson,* 926 F.2d at 25. Accordingly, the court determines that the two guns found in the third floor apartment at 21 Inwood Street are admissible.

■ Andrade makes one final point with respect to the search at 21 Inwood Street.

---

the search began. Campbell testified, however, that the consent search waiver was signed before the search began. The court determines that the more credible of this conflicting testimony is that of Campbell, who testified from a clear memory. Spinola, on the other hand, testified she had not remembered the consent search waiver at all until it was shown to her before the hearing by Andrade's counsel—and even then it appeared to have made no immediate impression on her memory.

6. It has been held in this Circuit that an officer's assertion that he would get a search warrant if consent to a search were not granted does not make consent involuntary. *United States v. Miller,* 589 F.2d 1117, 1132 & n. 13 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Maling,* 746 F.Supp. 223, 230–31 (D.Mass.1990), *vacated and remanded on other grounds,* 942 F.2d 808 (1st Cir.1991), *and affirmed after remand,* 988 F.2d 242 (1st Cir.1993).

He says that the search exceeded the scope of the consent granted by Spinola. Presumably this argument is directed to the suppression of the Intratech manual and the ammunition found in the vinyl bag.

It appears from the record, however, that both these items were found at the same time and in the same place (on top of the hutch in the front bedroom) as the .38 caliber revolver. The vinyl bag was open, with its contents—the ammunition—openly displayed. The Intratech manual likewise was in plain view. Under these circumstances, the officers were justified in seizing these items. *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The court rules the vinyl bag and its contents and the firearms manual admissible.

### Conclusion

For the foregoing conclusions, the court denies, in all respects, Andrade's motions to suppress.