**UNITED STATES of America,**

**v.**

**Richard C. REID, Defendant.**

**No. CR.A. 02–10013–WGY.**

United States District Court,
D. Massachusetts.

July 17, 2002.

*See also* 206 F.Supp.2d 132.

Owen S. Walker, Office of the Federal Defender, Boston, MA, Tamar R. Birckhead, Federal Defender Office, Boston, MA, for Richard C. Reid, aka Abdul–Raheem, aka Abu Ibrahim Abdul Raheem.

Stephen G. Huggard, Washington, DC, for United States.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

Richard C. Reid ("Reid") asks this Court to suppress statements he made to federal investigators on two days, December 22 and 23, 2001—the date of the incident that

brought him before this Court [1] and the day after. Over the course of five days—June 11, 12, 18, 20, and 21, 2002—this Court heard live testimony and argument at a suppression hearing, most of which related to questions this Court answered at the close of the hearing. Those questions were: whether sedatives administered to Reid after he allegedly tried but failed to detonate an explosive device on board a trans-Atlantic flight rendered involuntary any statements he made to investigators after the flight landed, and whether the sedatives rendered ineffectual any waiver he may have made of the protections afforded him by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court found that Reid was not under the influence of any sedatives when the interrogations challenged by Reid began, several hours after the sedatives were administered. Hr'g Tr. at 5:35 to 5:40 [Docket No. 91]. The Court therefore rejected Reid's arguments that the sedatives rendered any statements made by him to investigators involuntary, or any waiver of his *Miranda* protections ineffectual. *Id.* at 5:39.

This Memorandum addresses a separate question posed by Reid in his motion and developed through a stipulation reached by the parties [Docket No. 70]. It is the question whether a statement made by Reid to a Massachusetts State Police Trooper as he was being transported to a temporary detention facility at Logan Airport—"I have nothing else to say"—constitutes an assertion by him of his right to silence under *Miranda* that mandates the suppression of any subsequent statements he made to federal investigators.

After an exposition of the relevant facts, this Court considers the merits of Reid's argument.

## II. BACKGROUND

The following facts are taken from Reid's Motion to Suppress Statements ("Def.'s Mot.") [Docket No. 55] and from the Government's Opposition to Defendant's Motion to Suppress ("Gov't's Opp'n") [Docket No. 63], as well as the Stipulation of Facts submitted jointly by the parties ("Stip.") [Docket No. 70]. [2]

On December 22, 2001, the police took Reid into police custody at approximately 12:55 p.m. Boston time, after the flight on which he allegedly attempted to detonate an explosive device—American Airlines Flight 63 from Paris to Miami—was diverted to and landed at Logan Airport in Boston. Four Massachusetts State Police officers boarded the plane, handcuffed Reid, and removed him from the plane. At around 1:00 p.m., one of the officers (it is unclear who) read Reid *Miranda* warnings. The officers then placed Reid inside a police cruiser so that he could be transported to the State Police barracks at the

---

1. For an exposition of the events that led to the filing of criminal charges against Reid, see this Court's opinion in *United States v. Reid*, No. 02–10013–WGY, slip op. at 2–3, 206 F.Supp.2d 132, —— – —— (D.Mass.2002) [Docket No. 72], *available at* http://pacer.mad.uscourts.gov/dc/opinions/young/pdf/richardreid.pdf.

2. This aspect of the motion was presented almost entirely on documentary evidence. Accordingly, while this Court has drawn reasonably inferences and found the relevant facts, should there be further proceedings no especial deference need be paid to the factual exposition, as the Court of Appeals will be in as equally good a position to review the documentary record. *See United States v. Charles*, 213 F.3d 10, 18 (1st Cir.2000) (stating that the basis for deference to a district court's findings of fact on appellate review of a motion to suppress is that the trial judge, "who hears the testimony, observes the witnesses' demeanor and evaluates the facts first hand, sits in the best position to determine what actually happened" (citation omitted)).

airport, where he would be detained temporarily. While in the car, the driver, State Trooper Louis Santiago ("Trooper Santiago"), asked Reid a number of questions, to which Reid responded by giving "non-committal answers." Def.'s Mot. at 2. Most of the questions Trooper Santiago asked Reid were mundane. For instance, Trooper Santiago asked Reid his name, to which Reid replied that his name could be taken from his passport. Stip.Ex. B (Interview of Trooper Santiago by Sergeant Michael F. Cronin, dated December 27, 2001) ("Cronin Interview"). Trooper Santiago also asked Reid where he was from, to which Reid stated Europe. *Id.* At some point while in the cruiser, Trooper Santiago also asked Reid "What happened on the plane?," which Reid answered by stating that nothing happened on the plane. *Id.* (Telephone interview with Trooper Santiago by FBI special agent Christopher A. Fullam, dated April 30, 2002) ("Fullam Interview"). Reid then asked Trooper Santiago "Where are the reporters?" *Id.* (Cronin Interview). Trooper Santiago answered that there were no reporters, because this was "not going to be a big deal." *Id.* Reid then asked a number of times where the media was and, according to Trooper Santiago, "eventually became indignant," and stated "You'll see. This will be a big deal." *Id.* Reid then said "I have nothing else to say." *Id.* At this point, the conversation between Reid and Trooper Santiago stopped. Def.'s Mot. at 3. For reasons not entirely clear, Reid was transferred from the cruiser driven by Trooper Santiago to another cruiser to be taken to the State Police barracks. Stip.Ex. B (Fullam Interview); Hr'g Tr. 1:41 to 1:42 (Testimony of FBI agent Charles J. Gianturco). Trooper Santiago was then assigned to another part of the investigation. *Id.*

Reid was taken to the State Police barracks at the airport at approximately 1:30 p.m. Gov't's Opp'n at 2. At 2:15 p.m., he was again read his *Miranda* warnings, although no questioning took place at that time. Def.'s Mot. at 3; Gov't's Opp'n at 3. Before any interrogation of Reid commenced, he rested in his cell and was given water. Def.'s Mot. at 5. Also before the interrogation, Reid was examined by Emergency Medical Technicians ("EMTs") Ian Riley ("Riley") and Steven Solletti ("Solletti"), who had been told by federal investigators that Reid had been forcibly medicated on board Flight 63 in unknown dosages. *Id.* at 3. After taking Reid's vital signs and observing that his blood pressure was elevated (130/100), and that his pulse was low (58), the EMTs recommended that Reid be taken to a hospital for further evaluation. *Id.* at 3–4. The federal investigators rejected the EMTs' recommendation, and proceeded instead to question Reid regarding what transpired on board the aircraft.

Federal investigators began interrogating Reid at around 5:07 p.m. The interview was conducted by FBI special agents Brad Davis ("Davis") and Charles Gianturco ("Gianturco"), and Department of State Diplomatic Security Service agent Dan Choldin ("Choldin"). At that time, the agents again informed Reid of his *Miranda* protections, which he said he understood. Gov't's Opp'n at 4. He agreed to be questioned by the federal investigators, who then proceeded with the interview. During the interview, Reid received water and was offered but declined food. *Id.* The interview lasted approximately two and a half hours. Reid answered many questions but declined to answer several others. Hr'g Tr. at 1:60 (Testimony of agent Gianturco) [Docket No. 77]; *id.* at 3:8, 3:10 to 3:11, 3:12 (Testimony of agent Davis) [Docket No. 79]; *id.* at 3:46, 3:49 (Testimony of agent Choldin). That evening, after the interview ended, Reid was

transported to the Plymouth County Correctional Facility (the "Plymouth Facility").

The following day, December 23, 2001, agents Davis and Choldin resumed questioning Reid at the Plymouth Facility at around 5:10 p.m. They reminded him of his *Miranda* safeguards, which he said he understood. He also signed a form acknowledging that he understood his rights and agreed to be questioned. Def.'s Mot. at 5 & Ex. D (*Miranda* consent agreement, signed by Reid, dated December 23, 2001); Gov't's Opp'n at 4.

## III. DISCUSSION

Reid argues that his statement to Trooper Santiago, "I have nothing else to say," constitutes an invocation of his right to silence under *Miranda*. Invocation of the right to silence, Reid argues, compels this Court to suppress any statements he made to federal investigators after the invocation, including the substance of the interviews by agents Gianturco, Davis, and Choldin on December 22 and 23. Def.'s Mot. at 6–7. The government responds by arguing, first, that Reid's statement to Trooper Santiago was not an unequivocal assertion of Reid's right to silence. Second, even if Reid's statement was an invocation of his right to silence, federal investigators scrupulously honored Reid's right to silence by waiting several hours after the statement before interviewing him and by asking him if he would like to discuss the events that transpired on board Flight 63 before reinitiating interrogation. According to the government, if this Court accepts either of these two propositions, then all of the statements Reid made to federal investigators after 5:00 p.m. on December 22 are admissible, because none of them were made in violation of the protections afforded Reid by *Miranda*.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the Fifth Amendment to the Constitution of the United States, made applicable to the states through the Fourteenth Amendment, requires that the police inform individuals in custody and subject to interrogation regarding criminal activity that they have a right to remain silent in response to police questioning. *Id.* at 467–68, 86 S.Ct. 1602. Once this protection attaches, when the individual is in custody and subject to interrogation, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. 1602. This passage raises two questions that are relevant to Reid's motion to suppress. First, how clearly must a suspect articulate a desire to remain silent in order for the request to act as a bar to subsequent police questioning? Second, when, if ever, may police reinitiate questioning once the suspect has stated his wish to remain silent?

As to the first question, *Miranda* itself says that a suspect's assertion of the right to remain silent "in any manner" compels the police to cease questioning. 384 U.S. at 473–74, 86 S.Ct. 1602. The Supreme Court has declined to say more on this point. It has, however, said more about the degree of clarity with which a suspect must invoke his right to have counsel present during an interrogation, another important safeguard recognized by the *Miranda* decision. In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Court stated that in order for a suspect to invoke the *Miranda*-based right to counsel, the suspect must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interro-

gation by the police." *Id.* at 178, 111 S.Ct. 2204. More recently, in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Court elaborated upon what it said in *McNeil* by stating that in order for the police to be required to cease questioning, "the suspect must unambiguously request counsel," which means that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459, 114 S.Ct. 2350.[3] In *Davis*, the Court rejected the argument that the suspect's statement to the effect that "Maybe I should talk to a lawyer" constituted an unambiguous assertion of his right to counsel, and therefore declined to suppress statements made by the suspect to the police after making that statement. *Id.* at 462, 114 S.Ct. 2350.

The government urges this Court to import the demanding *Davis* standard for invocation of the right to counsel into the right-to-silence context. Many courts have done just that. *E.g., Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir.2001); *United States v. Hurst*, 228 F.3d 751, 759–60 (6th Cir.2000); *United States v. Banks*, 78 F.3d 1190, 1197–98 (7th Cir.1996), *vacated on other grounds sub nom. Mills v. United States*, 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994). This Court is one of them. *Bui v. DiPaolo*, 985 F.Supp. 219, 227 (D.Mass.1997) (holding that a suspect's statements to the police to the effect that "his Constitution will protect him," that the police "have nothing," along with his negative response to a police question whether he had "anything to say about what he was being arrested for," followed by his question "who said I did this?," did not amount to a clear invocation of the right to remain silent under *Davis* ), *aff'd on other grounds*, 170 F.3d 232 (1st Cir.1999). The First Circuit, however, has declined to decide whether the standard articulated in *Davis* applies in the right-to-silence context, despite having had at least two opportunities to do so. *Bui v. DiPaolo*, 170 F.3d 232, 239 (1st Cir.1999) ("Although the similarity of the analyses requisite for assessing claims anent *Miranda's* right to counsel and its right to remain silent suggests that *Davis* constitutes strong evidence of how the Supreme Court likely would decide this right to remain silent question, we acknowledge that *Davis* does not 'authoritatively' answer the question in the narrow, technical sense of that term."); *United States v. Andrade*, 135 F.3d 104 (1st Cir.1998), *aff'g* 925 F.Supp. 71, 79 (D.Mass.1996) (Lindsay, J.) (applying the *Davis* standard to the right to silence).

 This Court acknowledges that it has, in the past, endorsed *Davis* in the right-to-silence context, and it does not retreat from that position here, even though neither the Supreme Court nor the First Circuit has yet applied *Davis* to a case involving the right to silence.[4] In the

---

**3.** As the government points out, although *Davis* involved an appeal from the United States Court of Military Appeals, the Supreme Court based its decision on the Fifth Amendment to the United States Constitution, because the Court of Military Appeals has held that the Self–Incrimination Clause of the Fifth Amendment governs the admissibility of evidence at trials by court-martial. *Davis,* 512 U.S. at 457 n. *, 114 S.Ct. 2350. This Court therefore accepts *Davis* as binding on it, at least insofar as that case addresses invocation of the Fifth Amendment, or *Miranda*-based, right to counsel. As will be discussed below, however, the more important question is whether the rule announced in *Davis* ought be imported into cases involving invocation of the right to silence.

**4.** There may be good reasons not to apply *Davis* to alleged invocations of the right to

opinion of the Court, however, even if the *Davis* standard applies to the determination of whether the right to remain silent has been properly invoked as matter of law, as matter of fact Reid's statement that "I have nothing else to say" was a sufficiently pellucid invocation of his right to remain silent to satisfy *Davis* or any other standard.

Reid did not say "maybe" or use language suggesting hesitation as did the suspect in *Davis*. 512 U.S. at 455, 462, 114 S.Ct. 2350. He did communicate in a mode that is subject to multiple interpretations as did the suspect in *Andrade*, who merely directed dismissive hand gestures toward some of the interrogators. 925 F.Supp. at 80. He did not continue to talk with police after making the putative invocation of the right to silence as did the suspect in *Bui*, who, immediately after responding in the negative to the question whether he had anything to say about why he was being arrested, drew the police back into a conversation by asking "who said I did this?" 985 F.Supp. at 226.

Instead, Reid used words that no reasonable police officer could understand to be anything other than an expression of a desire to stop answering police questions. He used the word "nothing," which hardly can be considered ambiguous. He used the word "else," which means "additional" or "more." *American Heritage Dictionary* 446 (2d college ed.1985). He used these words in reference to what he had "to say." Viewed in combination, these words leave no doubt that Reid did not want to say anything more to Trooper Santiago in the State Police cruiser.

■ The government argues, and the Court agrees, that these words cannot be viewed in isolation, but should be viewed in the context of the entire conversation between the suspect and the police. *See, e.g., Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir.2001) ("To determine whether a defendant has unequivocally invoked the right to remain silent, the defendant's statements are considered as a whole."); *Medina v. Singletary*, 59 F.3d 1095, 1104 (11th Cir.1995) ("[A] court must consider

---

silence. First, a suspect's invocation of the right to counsel during custodial interrogation places a much greater obstacle in front of investigators than does an invocation of the right to silence, for while invocation of the right to counsel requires the police to stop the interrogation until a lawyer is present or the suspect voluntary reinitiates questioning, *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), invocation of the right to silence does not prevent the police from later reinitiating questioning, so long as the police "scrupulously honored" the suspect's right to remain silent, *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The concern about the effect of *Edwards* was part of what drove the Court to rule as it did in *Davis*, that only an unambiguous assertion of the right to counsel triggers the *Edwards* rule. *Davis*, 512 U.S. at 459–60, 462, 114 S.Ct. 2350. Because *Edwards* does not apply in the right-to-silence context, there may be less reason to be concerned that protecting an ambiguous invoca-

tion of the right to silence will serve as a "wholly irrational obstacle[ ] to legitimate police investigative activity." *Id.* at 460, 114 S.Ct. 2350 (citation omitted).

Additionally, the Court in *Miranda* expressly noted with respect to the right to silence that assertion of that right "in any manner" compels the police to cut off questioning. 384 U.S. at 473–74, 86 S.Ct. 1602. No such mention is made in *Miranda* of the manner in which a suspect must articulate the right to counsel, which left the Court free to answer that question in *McNeil* and *Davis*. These and other reasons may counsel adopting a more relaxed standard with respect to invocation of the right to silence vis-a-vis the right to counsel. *See generally* Wayne D. Holly, *Ambiguous Invocations of the Right to Remain Silent: A Post–Davis Analysis and Proposal*, 29 Seton Hall L.Rev. 558, 569–580 (1998) (raising these and other distinctions in arguing against application of *Davis* to the right to silence).

the entire context in determining whether a suspect has invoked his or her constitutional rights."). The Court disagrees with the government, however, that the relevant context somehow renders ambiguous the statement "I have nothing else to say." The government attributes great significance to the fact that, when agents Gianturco, Davis, and Choldin began interrogating Reid shortly after 5:00 p.m., Reid not only agreed to speak to the them, but in fact "spoke freely and eagerly about many topics, choosing strategically and selectively at times not to comment on certain subjects about which the agents inquired." Gov't's Opp'n at 22; *see also id.* at 27–28 (emphasizing Reid's statements made after 5:00 p.m. as part of the relevant context in determining whether Reid's earlier statement constituted an unequivocal assertion of his right to silence). In the Court's view, these later statements, given by Reid almost four hours after he declared that he had nothing else to say, are too temporally remote from that declaration to be considered part of the relevant context.[5] Instead, the statements given by Reid to the federal investigators after 5:00 p.m., bear on the question whether, assuming Reid's assertion of his right to silence was otherwise unambiguous, the police scrupulously honored Reid's right to cut off questioning. That question is taken up later.

█ The relevant context from which this Court ought draw in determining whether "I have nothing else to say" is ambiguous includes statements made closer in time to Reid's statement that he had nothing else to say, during the same conversation in which he uttered those words. As it happens, because the police stopped questioning Reid for almost four hours after he made that statement, any statements made by Reid that might shed light on what he meant when he said he had "nothing else to say" were made before he made that statement, while in the cruiser with Trooper Santiago. At the outset, the Court notes that the fact that Reid answered other questions posed by Trooper Santiago before stating "I have nothing else to say" does not alone inject ambiguity into that statement. *Miranda* made clear that a suspect may assert his right to remain silent "at any time prior to or *during* questioning." 384 U.S. at 474, 86 S.Ct. 1602 (emphasis added.) Only if Reid's earlier answers to questions suggest that, in context, "I have nothing else to say" was meant by Reid to be something less than a desire to cut off questioning do those earlier answers take on legal significance. In this case, the Court finds nothing in Reid's remarks to Trooper Santiago leading up to the cessation of questioning that narrows the scope or diminishes the significance of Reid's ultimate statement in the police cruiser. At best for the government, the banter between Reid and Trooper Santiago leading up to "I have nothing else to say" suggests that Reid may have been annoyed at Trooper Santiago's suggestion that there would be no reporters and that "this incident was

---

5. This Court does not attempt to fashion a bright-line rule for when a statement made by a suspect becomes too temporally remote from the alleged invocation of the right to silence to allow its consideration as part of the relevant "context" in determining the meaning of the alleged invocation. The fact that a statement is made after the alleged invocation does not render that statement ineligible for consideration as part of the relevant context. Indeed, in this Court's decision in *Bui*, the Court attributed significance to the fact that, immediately after the suspect said "no" in response to an officer's question whether the suspect wanted to say anything about why he was being arrested, the suspect then asked "Who said I did this?," 985 F.Supp. at 226, suggesting that the suspect did indeed want to continue talking with the police.

not going to be a big deal," and that Reid therefore no longer wanted to speak with Trooper Santiago. Stip.Ex. B (Cronin Interview). Even viewed in this way, Reid's ultimate statement does not suggest that he might be willing to speak with Trooper Santiago later, or that he was willing to talk to others besides Trooper Santiago at the time, within the cruiser or without. In short, this version of the events that transpired inside the State Police cruiser does not alter the Court's conclusion that the actual words used by Reid were themselves a clear articulation of Reid's desire not to answer any more questions.

■ Moreover, although the test for whether a suspect has invoked the right to silence is an objective one, *e.g., Hurst,* 228 F.3d at 759–60 (citing *Davis,* 512 U.S. at 459, 114 S.Ct. 2350), that is, the test turns on how a reasonable police officer would perceive the suspect's words, not on how the officer at the scene actually perceived the suspect's words. The Court attributes significance to the fact that questioning of Reid did in fact stop for several hours after he said "I have nothing else to say." Reid made that statement sometime between 12:55 p.m. on December 22, 2001, when Flight 63 landed at Logan Airport, Gov't's Opp'n at 2, and 1:30 p.m., when he arrived at the State Police barracks, *id.* After Reid uttered those words, Trooper Santiago asked Reid no further questions in the police cruiser. *See* Stip.Ex. B (Cronin Interview). Federal investigators then waited almost four hours, until just after

5:00 p.m., and read Reid his *Miranda* warnings twice (once at 2:15 p.m., without any questions following the warnings), before resuming questioning of Reid. Gov't's Opp'n at 3–4.[6] That a number of investigators declined to ask Reid any further questions for a significant period of time after he said "I have nothing else to say" suggests that they did perceive Reid's statement to be an assertion of his right to remain silent. Even if they did not so perceive it as matter of fact, as matter of law a reasonable police officer should have interpreted that statement as an assertion of Reid's right to remain silent.

■ As the Supreme Court noted in *Davis* with respect to the right to counsel, "a suspect need not speak with the discrimination of an Oxford don" in order to invoke the right. 512 U.S. at 459, 114 S.Ct. 2350 (internal quotation marks omitted). A suspect's right to silence does not depend upon the use of particular, talismanic words which trigger the protection that the right affords. *United States v. Ramirez,* 79 F.3d 298, 304 (2d Cir.1996). The statement Reid uttered to Trooper Santiago was all that was required under the circumstances to trigger an obligation on the part of police to honor his right to silence: a short, direct statement to the police that he no longer wanted to answer questions. The Court therefore concludes that, under any standard for determining when a suspect has asserted the right to remain silent with the requisite clarity, Reid's statement was a sufficiently clear

**6.** To be sure, this last piece of information may not be significant, as it is possible that federal investigators had no communication with Trooper Santiago or knowledge that Reid said "I have nothing else to say" prior to the 5:07 p.m. interview. This would be somewhat surprising, however, given that Reid was transferred from the vehicle in which he made the statement to Trooper Santiago to a vehicle occupied by one of the federal investi-

gators, agent Gianturco, before he was transported to the State Police barracks, Hr'g Tr. at 1:41 to 1:42 (Testimony of agent Gianturco); Stip.Ex. B (Fullam Interview), and given that federal investigators attributed the delay in interviewing Reid, at least in part, to their efforts to coordinate the investigation with State Police Troopers, Hr'g Tr. at 3:5 (Testimony of agent Davis).

assertion of that right. When Reid told Trooper Santiago "I have nothing else to say," he invoked his right to remain silent clearly and unambiguously.

■ This leads the Court to the question implied by the Supreme Court's statement in *Miranda* that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473–74, 86 S.Ct. 1602. That question is if, or when, may police resume the interrogation where the suspect has invoked the right to remain silent? The Supreme Court has had more to say about this question than it has about the first—how unambiguous must one's invocation of the right to silence be for legal significance to attach? In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), in fact, the Court addressed precisely this question, and said:

> [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation [once a suspect has invoked the right to remain silent], regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, ... the Miranda opinion can[not] sensibly be read to create a *per se* proscription of· indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

*Id.* at 102–03, 96 S.Ct. 321. The Supreme Court, therefore, concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. 321.

This linguistic formulation, by itself, is not terribly helpful to lower courts. In applying the standard, however, the Supreme Court in *Mosley* emphasized a number of factors that led it to conclude that the suspect's right to cut off questioning had been scrupulously honored by the police, factors onto which lower courts have latched in determining whether a statement made after the right to silence has been invoked need be suppressed. In *Mosley*, the Supreme Court found it significant that: (1) the interrogation ceased immediately after the suspect stated that he did not want to discuss a particular crime; (2) a significant period of time— two hours—elapsed before officers attempted to speak with the suspect again; (3) when the police reinitiated questioning, they·read the suspect the *Miranda* warnings again; (4) a different police officer reinitiated questioning of the suspect from the one who questioned him initially; (5) the subsequent interrogation regarded a different crime; and (6) the police did not in any way attempt to persuade the suspect to "reconsider his position" on silence or "make him change his mind" on that point. *Id.* at 104–06, 96 S.Ct. 321.

The First Circuit has followed the Supreme Court's lead in adopting a totality-of-the-circumstances approach to determining whether the police honored a suspect's right to cut off questioning. In *United States v. Barone*, 968 F.2d 1378 (1st Cir.1992), the First Circuit stated that "the inquiry in *Mosley* involves a multiple factor review.... [C]ourts must consider, *inter alia*, the time that elapsed between interrogations, whether fresh warnings were provided, the scope of the second interrogation, and the intensity with which the officers pursued questioning after the suspect asserted the right to silence." *Id.*

at 1383–84. In *Barone*, the court affirmed the district court's suppression of statements made by the suspect after he invoked the right to silence, emphasizing that: (a) the suspect was approached four times by the police after invoking his right to silence before he began to answer questions; (b) on two of those occasions the police intimated that the suspect would be in substantial danger if he returned home without cooperating with the police; (c) on none of those occasions did the police give the suspect a full set of *Miranda* warnings; (d) the suspect was detained for a significant period of time—over twenty-four hours—before making statements. *Id.* at 1385–86.[7]

In a more recent case, however, the First Circuit ruled that the police scrupulously honored the suspect's right to cut off questioning, where "[a] reasonable interval separated the two periods of questioning, and there was no repeated attempt to reverse a refusal to talk through undue pressure." *Andrade*, 135 F.3d at 107 (citations omitted). In so ruling, the court distinguished the case from *Barone* on the ground that in that case "the defendant resisted questioning, was held for over 24 hours, was interrogated four times before he began to discuss the crime, and was twice intimidated by suggestions that he 'would be in substantial [physical] danger if he returned to Boston without cooperating.'" *Id.*

In the Court's view, this case is more like *Andrade* than *Barone*. Here,

the police ceased questioning Reid immediately after he stated "I have nothing else to say." Stip.Ex. B (Cronin Interview). Reid was not questioned again until almost four hours later, Hr'g Tr. at 1:57 (Testimony of agent Gianturco), long enough to demonstrate respect for his invocation of silence, but not so long as to wear down his resistance through the coercive effect of incarceration. During that four-hour interval, investigators read Reid his *Miranda* warnings twice, once without any subsequent questioning. Def.'s Mot. at 3–4; Gov't's Opp'n at 3–4. After the second *Miranda* warning, agents Gianturco, Davis, and Choldin asked Reid whether he wanted to speak with them; he said he did. Hr'g Tr. at 1:57 (Testimony of agent Gianturco); *id.* at 3:6 to 3:7 (Testimony of agent Davis); *id.* at 3:45 (Testimony of agent Choldin). Agent Davis further instructed Reid that "he could either cease the interview or not answer a particular question that we had posed to him," which Reid said he understood. *Id.* at 3:7. The subsequent interrogation was not hostile or confrontational, but instead conversational, with Reid answering some questions while declining to answer others. *Id.* 1:59 to 1:60 (Testimony of agent Gianturco); *id.* at 3:8, 3:10, 3:11 to 3:12 (Testimony of agent Davis); *id.* at 3:46 to 3:47 (Testimony of agent Choldin). The record is devoid of any indication that the investigators attempted to talk Reid out of his earlier decision not to say anything more.

To be sure, there are characteristics of the interview that cut in Reid's favor. One

---

7. The length of time that a suspect remains in custody before the police reinitiate questions can cut both ways under *Mosley*. On one hand, if the police recommence interrogation too soon after the suspect invokes the right to silence, it may suggest that the police attempted to badger the suspect out of his silence. *See, e.g., Mosley*, 423 U.S. at 106, 96 S.Ct. 321 (finding support for its decision not to suppress statements in the fact that, after the

suspect invoked the right to silence, the police "resumed questioning only after the passage of a significant period of time"). On the other hand, if the police detain a suspect for too long prior to questioning, a court may conclude that the police utilized the coercive effect of incarceration to convince the suspect to speak. *See, e.g., Barone*, 968 F.2d at 1385–86.

of them is the fact that the federal investigators refused the request of EMTs Riley and Solletti to take Reid to a local hospital after learning that his vital signs, particularly his blood pressure and his pulse, were abnormal. As the Court has already ruled, however, these and other observations about Reid do not mean that he was still under the effects of sedatives when the interrogation began. Hr'g Tr. at 5:35 to 5:36, 5:39. More important under *Mosley,* however, is the fact that the investigators in no way attempted to capitalize on the possibility that Reid might still be under the effects of sedatives as a means to coax him out of his silence. To the contrary, investigators postponed the interview with Reid, in part so that they could confirm that Reid was well enough to speak with them. Hr'g Tr. at 1:50 to 1:51 (Testimony of agent Gianturco).

Another characteristic of the interview helpful to Reid's position is that federal investigators interrogated Reid about the same subject matter as had Trooper Santiago when Reid said "I have nothing else to say." The Supreme Court in *Mosley* based its conclusion that the police scrupulously honored the suspect's right to cut off questioning in part on the fact that when police resumed questioning, their questions regarded a different crime. 423 U.S. at 104, 106, 96 S.Ct. 321. In the end, however, these two facts are overwhelmed by every other feature of the interview of Reid by federal investigators, which make clear that the investigators scrupulously honored Reid's right to cut off questioning.

## IV. CONCLUSION

Although Reid unequivocally asserted the right to silence guaranteed him by the Fifth Amendment to the Constitution and *Miranda,* it is equally clear that once he invoked that right, his interrogators scrupulously honored it. Accordingly, Reid's

Motion to Suppress Statements [Docket No. 55] is DENIED.