**UNITED STATES of America**

v.

**Kenya TEEMER, Defendant**

**No. CRIM.02–122–P–C.**

United States District Court, D. Maine.

May 1, 2003.

Jonathan A. Toof, Office of the U.S. Attorney, Portland, ME, for U.S.

Nicholas J.K. Mahoney, Law Offices of Nicholas J.K. Mahoney, P.A., Biddeford, ME, for Defendant.

## MEMORANDUM OF DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Senior District Judge.

Now before the Court is Defendant Kenya A. Teemer's Motion to Suppress (Docket Item No. 18) statements made on the evening of October 29, 2002. Defendant contends that prior to his formal arrest, he was in custody and made inculpatory statements to a law enforcement officer, in violation of his *Miranda* rights under the Fifth Amendment to the United States Constitution. Defendant argues that these statements should be suppressed and that his subsequent arrest based on these statements was invalid. Defendant further claims that later statements made to law enforcement officers during an interview at a police station were also made in violation of his *Miranda* rights and should be suppressed.

## I. Facts

At approximately 4:00 p.m. on October 29, 2002, Officer Gayle Petty of the Portland Police Department stopped a 2003 Mitsubishi for failing to stop at a stop sign. Officer Petty pulled the vehicle over on a major thoroughfare in downtown Portland, in front of Portland High School. The owner and driver of the car was co-defendant Justin Stubbs, who, Officer Petty learned, was operating under a suspended Maine driver's license.[1] In addition to Justin Stubbs, there were two other passengers in the car: Amanda Bailey in the front passenger seat and Defendant Kenya Teemer in the back seat, on the passenger side. While Officer Petty was writing a summons for Mr. Stubbs for failing to stop for a stop sign, Portland Police Dispatch ("Dispatch") assigned her a back-up unit, and in less than five minutes from the time of the initial stop, Officer Robert Hawkins pulled in behind her as she was writing Mr. Stubbs his ticket.

After issuing Mr. Stubbs his ticket, Officer Petty asked him to step out of the car. She then placed him under arrest for operating after suspension of his driver's license and, after handcuffing him, placed him in the back of her police cruiser. As she did so, Officer Petty asked Mr. Stubbs if there was anything she should know about in his vehicle, and he informed her that he had a gun in his trunk and ammunition in the glove box. Transcript of Suppression Hearing ("Transcript") at 13. Her subsequent search of the vehicle revealed an AK–47 gun in the hatchback portion of the car.[2] Transcript at 17. She

---

1. Mr. Stubbs also held an expired Ohio driver's license.

2. Officer Petty described the hatchback where the gun was found as "not actually a separate part of the interior of the car .... [ ] the seats

also found ammunition, boxes, and loose rounds throughout the back of the hatch-back, as well as two fully-loaded magazines for the gun in the glove compartment of the car. *Id.* at 18–19.

While Officer Petty was securing Mr. Stubbs in the back seat of her cruiser, Officer Hawkins remained by the passenger side of the Mitsubishi, where he asked the passengers to step out of the car so that he could ask them for identification in order to determine if either one of them had a drivers license that would authorize one of them to drive the car home. *Id.* at 53–54. Once out on the sidewalk next to the car, the female passenger identified herself as Amanda Bailey, and she provided only a learner's permit to drive a vehicle. Defendant, the other passenger, identified himself as Kenya Teemer and stated that he did not possess any identification or license. *Id.* at 56. Officer Hawkins then asked him if he was on probation anywhere or if he had ever been arrested. Defendant informed Officer Hawkins that he was on probation in Georgia "for fighting," but he was unable to identify his probation officer. *Id.* at 58–59.

Officer Hawkins then contacted Dispatch to determine if Defendant had a valid license in Maine, Ohio, or Georgia, and all three states reported that they had no information on Defendant. Although Defendant's probationary status was still undetermined, Officer Hawkins at that point asked him and Ms. Bailey if they needed to place a call to find somebody to come pick them up, since neither of them could drive the car. Both individuals responded that they were "all set." *Id.* at 60.

Shortly after that exchange, Officer Hawkins learned from Officer Petty about the gun in the back of the car. Without saying anything to either Defendant or Ms. Bailey, Officer Hawkins radioed Sergeant Kevin Cady, a supervisor, and asked him to come down to the scene. *Id.* at 61. During that time, Defendant and Ms. Bailey stood on the sidewalk in front of Portland High School, talking and smoking cigarettes.[3] When Sergeant Cady arrived a few minutes after being called on the radio, Officer Hawkins joined both him and Officer Petty at the back of the car where the gun was, while Defendant and Ms. Bailey remained alone on the sidewalk, approximately fifteen feet away from the officers, *id.* at 99, and they were left unattended for approximately three minutes while the officers conferred. *Id.* at 114. During that time, Sergeant Cady learned that Defendant had no identification and that he was wanted by Georgia for a probation violation, but that it was as yet unknown whether he was on probation for a prior felony. *Id.* at 64. Sergeant Cady then proceeded to speak with Defendant, while Officer Hawkins secured the gun.

During his conversation with Defendant, Sergeant Cady asked him if there would be a chance that his fingerprints would be found on the weapon if the police were to lift fingerprints from it. Defendant replied that his fingerprints would be found

flip right down, giving you access to that compartment." Transcript at 16. She explained that the rear seats split when one of them was pulled down. *Id.*

3. On cross-examination, Officer Hawkins indicated that at one point, he did have to tell Defendant to move away from the police cruiser that held Mr. Stubbs. That was because Defendant and Mr. Stubbs were gesturing to and making faces at each other, and were trying to talk to one another as Defendant approached Mr. Stubbs, seated in the back of the cruiser. *See* Transcript at 78–79, 84. Officer Hawkins explained that he felt that that was an "officer safety situation," and he asked Defendant not to continue any further toward the car. *Id.* at 79, 84.

on the rifle because he had moved it, although he had never fired the gun. *Id.* at 105. At that point, Sergeant Cady decided to further investigate Defendant's probationary status in Georgia, specifically in order to ascertain whether Defendant was on probation for a felony. Sergeant Cady testified that he went to and sat in his car to make the investigatory calls on his cell phone. *Id.* at 110. During that time, Defendant and Ms. Bailey remained upon the sidewalk, smoking and conversing. Although there were officers in their vicinity at that point, the officers were not guarding either of the two individuals. *Id.* at 114.

After making the calls to Dispatch, Sergeant Cady learned that the State of Georgia was not willing to extradite Defendant. In addition, Sergeant Cady learned that Defendant *had* been convicted of a felony. Upon learning that Defendant was, indeed, a convicted felon, Sergeant Cady instructed Officer Hawkins to arrest him on the charge of being a felon in possession of a firearm. *Id.* at 115.[4] Defendant was taken to the police station, where police intended to question him further.

At the police station, Defendant was interviewed by Officer Mark Teceno and, later, by an Alcohol, Tobacco, and Firearms agent. Officer Teceno's entire interview was videotaped, and the tape was offered and admitted into evidence at the suppression hearing.[5] At the outset of the interview, Officer Teceno obtained some biographical information from Defendant, and then he expressed his appreciation to Defendant for being so cooperative. Officer Teceno told Defendant that he was free to tell him anything he wanted, but that he did not think that Defendant was going to tell him anything he had not already heard, or that he was going to make things worse by talking to him. The officer indicated that they were "kinda straightening things out," and that "one hand washes the other." He then explained to Defendant that because he was under arrest, he was going to have to read him his rights. Officer Teceno began to read Defendant his rights, but then interrupted himself to tell Defendant that after each line he read, Defendant should say "yes" or "no" or nod his head if he understood. At that point, Defendant indicated to Officer Teceno that his father was a cop, who had told Defendant that if he was being read his rights and he were to say nothing, "that means you understood," and if he were to say "yes," that would mean he would have "already thrown away everything." Defendant then stated, "[s]o I won't be able to say anything after that." Defendant then proceeded to recite his *Miranda* rights back to Officer Teceno, and he finished by saying, "I'm not gonna say anything after that, because that would violate my rights." Officer Teceno responded to this statement of Defendant by advising him that he also had a right to tell his side of the story. He informed Defendant that if he did not tell his story, then all the police would have was Mr. Stubbs's version of events,[6] as well as the

---

**4.** Sergeant Cady believed that Defendant had been in constructive possession of the gun given his proximity and access to the firearm in the hatchback portion of the Mitsubishi. Transcript at 116–17.

**5.** At the time the videotape was admitted into evidence, the Government indicated that it was being admitted with the understanding that if the parties could agree to a redacted version, then that version would replace the

full video for the Court's viewing. Transcript at 137. However, the parties later advised the Court that they could not mutually agree on a redacted version and, therefore, the whole videotape remains in evidence and has been viewed and considered by the Court.

**6.** Officer Teceno never revealed to Defendant the substance of Justin Stubbs's version of the events.

observations of the police officers. When Defendant answered, "but anything I say can and will be used against me," Officer Teceno replied, "[t]rue, but anything you say will be used to help you as well." Defendant then stated, "I can help myself by just not saying anything." Nevertheless, Officer Teceno continued to explain to Defendant why it made sense to talk and explain his side of the story, and why he should give the officers "the whole picture." Eventually, Defendant's protestations subsided, and he made incriminating statements to Officer Teceno.

## II. Discussion

Defendant claims that at the time he made the statement regarding his handling of the AK–47, he was in custody for purposes of *Miranda*. Therefore, because he had not yet been read his rights when he made the incriminating statement, that statement and his subsequent statements were made in violation of his Fifth Amendment rights and should be suppressed. Further, Defendant argues that his arrest should be invalidated because it was made on the basis of information gained in violation of *Miranda*. Defendant also seeks to have suppressed any statements made at the police station to Officer Teceno and ATF Special Agent Malcom Van Alstyne, arguing that after Defendant clearly invoked his right to remain silent, Officer Teceno persisted in attempting to convince him to answer questions, and ultimately continued to question him. Defendant also argues that Officer Teceno's recitation of his rights under *Miranda* was circular and misleading, and "did not convey his substantial rights," and, therefore, that Defendant did not fully understand what his rights were and could not have voluntarily and intelligently waived them.

### A. The Statements to Sergeant Cady at the Time of the Stop

 It is well established that *Miranda* warnings must be communicated to a suspect before he is subjected to "custodial interrogation." *United States v. Li*, 206 F.3d 78, 83 (1st Cir.2000) (*citing United States v. Ventura*, 85 F.3d 708, 710 (1st Cir.1996)).[7] To find custodial interrogation,

> the court must first examine all the circumstances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was (1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and (2) express questioning or its functional equivalent.

*Ventura*, 85 F.3d at 712. *See also Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (*quoting California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). This inquiry is an objective test, and it does not depend on the subjective views of either the interrogating officers or the individual being questioned. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). Factors to consider in making the custody determination include: "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and

---

7. Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when law enforcement officers question an individual after he is "taken into custody or otherwise deprived of his freedom of action in any significant way," the officers must first warn that individual "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. at 1612.

character of the interrogation." *United States v. Jones,* 187 F.3d 210, 218 (1st Cir.1999) (*quoting United States v. Masse,* 816 F.2d 805, 809 (1st Cir.1987)). General "on-the-scene questioning" as to facts and circumstances surrounding a crime or other general questioning of citizens in the fact-finding process do not trigger *Miranda* warnings. *Miranda,* 384 U.S. at 477–78, 86 S.Ct. at 1629.

■ Prior to Defendant's formal arrest, the instant case does not reveal a custodial situation. First, the stop took place in a neutral setting, on a public road in downtown Portland in front of a local high school. Transcript at 7. *See Jones,* 187 F.3d at 218 ("a public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse.") Second, the number of law enforcement officers present, the degree of physical restraint, and the duration and character of interrogation all suggest a noncustodial situation. The setting was not one where "inherently compelling pressures" were put on the person interrogated. *Thompson,* 516 U.S. at 107, 116 S.Ct. at 462 (*citing Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624.) Defendant and Ms. Bailey were asked to get out of the car so that the officer could determine if they had identification and the appropriate authorization to drive the car, since their driver was under arrest. Transcript at 54. Once out of the car, both Defendant and Ms. Bailey moved freely about on the sidewalk, smoking and conversing. Transcript at 62, 68, 101, 114. *See Jones,* 187 F.3d at 218 (finding fact that defendant was with a companion to be a factor indicating defendant's situation was noncustodial). The only restriction of Defendant's movements occurred when Officer Hawkins asked him to continue no further in his approach toward the police cruiser that held Justin Stubbs. This instruction however, was made because Mr. Stubbs was in custody, and it was principally designed to ensure that *he,* rather than Defendant, was contained and secure. At no point was there more than one officer questioning Defendant at a time, and at no point did any officer raise his or her voice at either Defendant or Ms. Bailey, nor did the officers ever place their hands on them. In addition, Officer Hawkins, *after* learning from Defendant that he was on probation and *before* knowing for certain his probationary status, offered both Defendant and Ms. Bailey a chance to make a call to find someone to come pick them up. Transcript at 60.

While it is true that both Sergeant Cady and Officer Hawkins admitted that they would not have let Defendant leave before confirming his probationary status, Transcript at 91, 106, it is not the officer's subjective intentions that determine whether a situation is custodial or not. In *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984), the Supreme Court held that a motorist was not in custody for purposes of *Miranda,* even though the police officer knew he was going to take the motorist into custody and charge him with an offense, because the officer never communicated that intention to the motorist during the questioning. *Id.* ("A policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time.").

Similarly, it does not matter for purposes of custody whether the officers began to suspect that Defendant was a felon in possession during the questioning; it is "the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning." *Stansbury,* 511 U.S. at 323, 114

S.Ct. at 1529. Regardless of any suspicions that an officer might hold or be developing in his head, if he does not convey them to the defendant, then they do not affect the objective circumstances of an interrogation or interview, and they cannot affect the custody inquiry. *Id.* at 324, 114 S.Ct. at 1530. Officer Hawkins testified that after he learned of the gun and ammunition in the car, he did not then notify the Defendant or Ms. Bailey that they were not free to leave, and, despite the arrival of a third officer to the scene, their status did not change. Transcript at 61. If Officer Hawkins began to have suspicions about Defendant at that point, he did not express them; therefore, they could not have affected the objective circumstances surrounding the exchange between the law enforcement officers and Defendant.

As for Officer Cady, when he arrived on the scene, Defendant and Ms. Bailey had been left to themselves approximately fifteen feet away from the three conversing officers, *id.* at 99, and when Sergeant Cady eventually approached them, he immediately asked Defendant about the gun, without conveying to him that he knew anything about his probationary status or that he suspected he was a felon. *Id.* at 65, 102. It was not until after Defendant told him that he had touched the gun that Sergeant Cady returned to his car, ascertained that Defendant was a felon, and then communicated to Defendant that he was under arrest. *Id.* at 87–88, 115. The objective circumstances did not change until Sergeant Cady learned for certain that Defendant was a felon in possession of a firearm, and by that time any questioning of Defendant had ceased.

Finally, the entire duration of the stop, from the time Officer Petty stopped the car in front of Portland High School until Defendant was placed under arrest, was not much longer than thirty minutes. Looking at the objective circumstances surrounding the stop in this case, the Court finds that Defendant was not subject to any restraint on his freedom of movement of the degree associated with a formal arrest, and he was, therefore, not in custody for purposes of *Miranda.* The officer was not required to read him his rights at that point, and any statements he made are admissible in evidence.

## B. The Statements to Officer Teceno and Special Agent Van Alstyne at the Police Station

Once at the police station, there is no question that Defendant was in custody. As indicated above, *Miranda* warnings must be communicated to a suspect before he is subjected to "custodial interrogation." *Li,* 206 F.3d at 83 (*citing Ventura,* 85 F.3d at 710). Officer Teceno did communicate to Defendant that because he was under arrest, he was going to have to read him his rights. He then began to read Defendant his rights, only to interrupt himself by telling Defendant that he should either respond "yes" or nod his head to indicate that he understood. It was at that point that Defendant revealed that, in advising him on whether to respond to a law enforcement officer reading him his rights, Defendant's father had explained that if Defendant responded "yes," he would be waiving his rights. Thus, Defendant informed Officer Teceno that after he was read his rights, he "[would not] be able to say anything after that." Then, Defendant succinctly recited his rights to the officer. After finishing this recitation, Defendant again stated, "I'm not gonna say anything after that, because that would violate my rights."

▮ *Miranda* provides:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any

time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28.[8] In *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court discussed what is required for a defendant to invoke his *Miranda*-based right to counsel. Under *Davis,* in order for the police to be required to cease questioning, "the suspect must unambiguously request counsel," meaning that the individual "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362. Other circuits have applied the *Davis* rule that a suspect must clearly assert his right to counsel in the right-to-remain silent context. *See, e.g., Simmons v. Bowersox,* 235 F.3d 1124, 1131 (8th Cir.2001); *United States v. Hurst,* 228 F.3d 751, 759–60 (6th Cir.2000); *United States v. Banks,* 78 F.3d 1190, 1197–98 (7th Cir.1996), *vacated on other grounds sub nom. Mills v. United States,* 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Coleman v. Singletary,* 30 F.3d 1420, 1424 (11th Cir.1994). The Court of Appeals for the First Circuit, however, has declined to decide the applicability of *Davis's* requirement that a suspect must clearly articulate his wishes in the right-to-remain silent context. *See Bui v. DiPaolo,* 170 F.3d 232, 239 (1st Cir.1999) ("Although the similarity of the analyses requisite for assessing claims anent *Miranda's* right to counsel and its right to remain silent suggests that *Davis* constitutes strong evidence of how the Supreme Court likely would decide this right to remain silent question, we acknowledge that *Davis* does not 'authoritatively' answer the question in the narrow technical sense of that term"); *James v. Marshall,* 322 F.3d 103, 108 (1st Cir.2003) (when faced with evaluating a defendant's invocation of his right to remain silent in the *habeas* context, the court stated that it would "leave open again the issue of the applicability of *Davis* to both the right to counsel and the right to remain silent").

This district has not had an opportunity to address this issue. However, other courts in this circuit have done so, and have found that the *Davis* analysis applies to a suspect's invocation of his right to remain silent. *See Bui v. DiPaolo,* 985 F.Supp. 219, 227 (D.Mass.1997) (Young, J.); *United States v. Andrade,* 925 F.Supp. 71, 79 (D.Mass.1996) (Lindsay, J.); *United States v. Reid,* 211 F.Supp.2d 366, 371 (D.Mass.2002) (Young, C.J.); *Fortier v. Valerino,* No. CIV 00–48–B, 2001 WL 274754, at *2 (D.N.H. March 5, 2001) (Barbadoro, J.). Most recently, in *Reid,* the United States District Court for the District of Massachusetts found that although it believed there may be reasons for adopting a less exacting standard to invocations of the right to remain silent than the standard set forth in *Davis* for assertions of the right to counsel, defendant's statement that "I have nothing else to say" was

---

**8.** The Court notes that because Defendant himself recited his rights, and clearly understood and knew what these rights were, it is of little consequence that Officer Teceno never in fact finished reading Defendant his rights.

sufficiently unambiguous to satisfy *Davis*.[9] *Reid*, 211 F.Supp.2d at 372. The court distinguished these words from those of the defendant in *Davis* itself, who used the word "maybe" and language suggesting hesitation. *Id.* (*citing Davis*, 512 U.S. at 455, 462, 114 S.Ct. at 2353, 2357). It also distinguished *Andrade*, where the suspect merely directed dismissive hand gestures toward some of the interrogators, 925 F.Supp. at 80, and *Bui*, where the defendant, immediately after responding in the negative to the question whether he had anything to say about why he was being arrested, drew the police back into a conversation by asking "[w]ho said I did this?" 985 F.Supp. at 226. By contrast, the *Reid* court found that the defendant used words that "no reasonable police officer could understand to be anything other than an expression of a desire to stop answering police questions." *Id.* at 372.

■ Likewise, Defendant's statement, after he recited his rights to Officer Teceno, that "I'm not gonna say anything after that, because that would violate my rights," is a clear invocation of his right to remain silent, and are words that "no reasonable police officer could understand to be anything other than an expression of a desire [not to] answer[ ] police questions." *Reid*, 211 F.Supp.2d at 372. At that point, Officer Teceno should have ceased his questioning of Defendant. However, despite Defendant's clear statement that he did not wish to answer any questions at that point, Officer Teceno responded by immediately seeking to *persuade* Defendant that indeed he *should* talk. He emphasized for Defendant that besides his right to remain silent, he also had a right to tell *his* side of the story and that, if he did not, they had only the story of his co-defendant and the other police officers. Although Defendant appears to be confused as to the import of responding "yes" after each of his rights are read to him, the Court believes that the gist of what Defendant is conveying is that he does not wish to talk.[10] Further, the Court does

9. The *Reid* court pointed out that a suspect's invocation of his right to remain silent does not place as much of an obstacle before investigators as does the invocation of the right to counsel and, therefore, does not implicate the concern about the effect of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that in part drove the Court to rule as it did in *Davis*. Under *Edwards*, when an accused invokes his right to counsel, law enforcement must stop the interrogation until a lawyer is present or the suspect himself reinitiates questioning. *Id.* at 484–85, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. This rule led to the concern of the Court in *Davis* that an ambiguous invocation of the right to counsel would serve as a "wholly irrational obstacle[ ] to legitimate police investigative activity," and led them to set forth the rule that this right be unambiguously asserted and clearly articulated. *Davis*, 512 U.S. at 460, 114 S.Ct. at 2356 (*quoting Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975)). As the *Reid* court pointed out, however, *Edwards* does not apply in the right-to-silence context

because invocation of the right to silence does not prevent the police from later reinitiating questioning so long as the police "scrupulously honored" the suspect's right to remain silent. *Reid*, 211 F.Supp.2d at 372 n. 4 (*quoting Mosley*, 423 U.S. at 104, 96 S.Ct. at 326).

Additionally, the *Reid* court highlighted that the *Miranda* opinion itself specifically stated that a suspect's assertion of the right to remain silent "in any manner" compels the police to immediately cease any interrogation. *Id.* (*citing Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627). The *Miranda* Court made no similar mention of the manner in which a suspect must invoke his right to counsel, which is why the Court in *Davis* was "left . . . free" to answer that question. *Id.* According to the *Reid* court, these are all reasons why it might be advisable to "adopt[ ] a more relaxed standard with respect to invocation of the right to silence vis-à-vis the right to counsel." *Id.*

10. The Court notes that in the context of the standard *Miranda* warnings, Officer Teceno's

not believe that Officer Teceno was seeking to clarify whether Defendant wished to invoke his right to remain silent, but, instead, was attempting to persuade him that he should waive this right.

An examination of the remainder of the exchange only solidifies this Court's conclusion that Defendant had clearly meant that he did not want to answer any questions and that the police officer intended to change his mind. When Defendant continued to hold his ground in the face of Officer Teceno's cajoling, pointing out again that "anything I say can and will be used against me," Officer Teceno's reply of "[t]rue, but anything you say will be used to help you as well" clearly fits into what the *Miranda* court described as subtle compulsion. *Miranda*, 384 U.S at 474, 86 S.Ct. at 1628. Defendant's subsequent reply that "I can help myself by just not saying anything" was again met with reasons from Officer Teceno as to why Defendant should nonetheless talk.[11]

While this Court finds persuasive the reasoning of the *Reid* court when it opined that perhaps a standard so strict as the one set forth in *Davis* is not necessary in the right-to-silence context, *see supra* note 9, even applying the strict standard of

*Davis*, Defendant clearly and unambiguously invoked his right under *Miranda* to cut off all questioning. The Supreme Court has identified this right as a "critical safeguard" of an individual's overall Fifth Amendment right to remain silent, and it is a right the exercise of which must be "scrupulously honored" by law enforcement authorities. *Mosley*, 423 U.S. at 103, 96 S.Ct. at 326. Far from scrupulously honoring Defendant's assertion that he did not wish to answer his questions, Officer Teceno engaged in tactics, in a custodial setting, designed to convince Defendant to waive the right he had already invoked. Such efforts on the part of the officer resulted in a violation of Defendant's Fifth Amendment rights under *Miranda*, and any statements made after Defendant's invocation of this privilege will be suppressed.[12]

### III. Conclusion

For the foregoing reasons, the Court **ORDERS** that Defendant's Motion to Suppress any of his statements made to Sergeant Cady on the sidewalk at the scene and time of the stop be, and it is hereby, DENIED, and that Defendant's Motion to Suppress any statements made to Officer Teceno and ATF Special Agent Malcom

---

instruction to Defendant as to how to answer are inherently confusing. First, it did not permit the option of a negative answer. Second, the instruction did not make it clear whether in answering the questions Defendant was simply acknowledging that he *understood* the questions, or that he was giving a substantive answer to the questions themselves.

**11.** The Court notes that Officer Teceno even went so far as to minimize the importance of *Miranda* by telling Defendant, "[m]y boss says I have to read this thing to you, not that it means a whole lot."

**12.** The Court notes that it finds unavailing the Government's argument that even if the Court finds that Defendant did not waive his *Miranda* rights at the police station, his state-

ment should still remain admissible under *United States v. Byram*, 145 F.3d 405 (1st Cir.1998), because, although it was taken in violation of *Miranda*, it was voluntary under the "narrowed definition of coercion" set forth in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). *See* Government's Response to Defendant's Post–Hearing Brief on Defendant's Motion to Suppress and Supporting Memorandum of Law (Docket Item No. 36) at 9. However, the Court finds the instant case to be distinguishable from *Byram*; in the latter case there were no *Miranda* warnings given at all, in contrast to the case at hand, where warnings were given, the rights were invoked, and then were subsequently ignored.

Van Alstyne at the police station be, and it is hereby, GRANTED.